IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **L. JOE PITTS**, as Administrator of | ) | |
| the Estate of **SANDRA ANN** | ) | |
| **SPENCER PITTS**, Deceased, | ) | |
| | ) | |
| *PLAINTIFF,* | ) | CIVIL ACTION NUMBER: |
| | ) | |
| *VS.* | ) | 2:06cv1008-ID-SRW |
| | ) | |
| **BRIDGESTONE AMERICAS** | ) | |
| **HOLDINGS, INC.;** | ) | |
| **BRIDGESTONE FIRESTONE** | ) | |
| **NORTH AMERICAN TIRE, LLC;** | ) | |
| and **BFS RETAIL &** | ) | |
| **COMMERCIAL OPERATIONS,** | ) | |
| **LLC**, doing business as | ) | |
| FIRESTONE TIRE & SERVICE | ) | |
| CENTERS, jointly and severally, | ) | |
| | ) | |
| *DEFENDANTS.* | ) | |

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION TO COMPEL
PRODUCTION OF TESTIMONY AND MATERIALS CONCERNING
OTHER NEGLIGENT TIRE PUNCTURE REPAIRS PERFORMED BY
THE DEFENDANT BFS RETAIL & COMMERCIAL OPERATIONS, LLC**

**PRELIMINARY STATEMENT**

On June 19, 2006 Sandra Pitts was riding as a passenger in her vehicle on

the way to her oldest son's college orientation at South Alabama. Her older son

Joe was driving and her younger son Greg was in the back seat. As they were

passing through Butler County on I-65 at approximately 10:50am Sandra's vehicle

suffered a tread separation of its left rear tire. This caused the vehicle to roll over causing Sandra's partial ejection and death. Plaintiff Joe Pitts has brought claims for his wife's wrongful death against the defendants for their negligent repair of Sandra's tire which caused the tread separation and her death.

On February 26, 2005 the defendant BFS Retail & Commercial Operations, LLC ("BFRC") performed a repair of a puncture in Sandra Pitts's left rear tire at its Madison Avenue store in Montgomery. BFRC's invoice for this repair is attached hereto as **Exhibit A**. The invoice identifies a "PATCH-PLUG" repair as having been done on Sandra's car on that date. Although she was charged for and paid for this "PATCH-PLUG" repair, Sandra's left rear tire was actually repaired using a "string" or "plug" insert only. Testimony and documents produced by the defendants definitively prove that this "string only" or "plug only" repair is improper and below the standard of care in the tire repair industry. The only proper repair is one which uses both a plug and inside patch, which is exactly what Sandra was charged and paid for. Defendants' own documents prove this definitively:

### BFRC TIRE RESOURCE MANUAL (BFS 544-BFS 551)
(attached hereto as **Exhibit B**)

- Repairs of all tires (radial and non-radial) must be of the plug and inside patch type. **Using plugs alone on any type of tire is not a safe repair.** (BFS 548, *emphasis in original).*

2

- **. . . Using plugs alone on any type of tire is not a safe repair. Therefore, repairs of all tires (radial and non-radial) should be of the plug and inside patch type.** (BFS 549, *emphasis in original*).

Similarly, the deposition testimony of BFRC's FRCP 30(b)(6) representative William N. Sheridan, Jr. establishes that this policy is, and has long been, the industry standard as well as BFRC's official policy regarding tire puncture repair:

**APRIL 20, 2007, DEPOSITION OF WILLIAM N. SHERIDAN, JR.**
(attached hereto as **Exhibit C**)

**Q (BY MR. BRUNER:) Okay. And it is my understanding that it is BFRC's position that it is never appropriate to use a string plug repair by itself on a tire.**

**A That is correct.**

**(Sheridan Deposition, Pgs. 74-75)**

**Q Okay. Has there ever – You've been at Firestone for some time. You've been at BFRC for some time. Has there ever been any other policy with respect to tire puncture repair while you've been there?**

**A No.**

**Q In your entire time in the industry, has that been the standard, that a repair which both fills a puncture and seals the inner liner be used?**

**A The tire manufacturers have always said that you should fill it that way.**

**Q Okay. Do you agree that, in 2005, that was the industry standard for tire puncture repair?**

**A Yes.**

**(Sheridan deposition, Pg. 77)**

The importance of following this standard is made clear by the same materials and testimony. As can be seen from the following excerpts, these defendants know that the consequences of doing a "plug-only" or "string-only" repair can be catastrophic.

**APRIL 20, 2007, DEPOSITION OF WILLIAM N. SHERIDAN, JR.**
(attached hereto as **Exhibit C**)

**Q  This is marked as Plaintiff's 6.  Do you recognize the document I've marked as Plaintiff's 6 and handed you?**

**A  Yes, I do.**

**Q  What is that?**

**A  That's our Tire Resource Manual.**

**Q  And how is this used at BFRC?**

**A  This is used, you know, by store teammates, to help identify, you know, some of the procedures on tires and products that we sell.**

**Q  And you keep using the term *teammates*.  That's basically employees?**

**A  Employees.  Correct.**

**Q  BFRC parlance for employees?**

**A  Correct.**

**Q  Okay, I want to direct your attention to Page – Its Page 61 on this, and it's BRC 547.  Right there under *Tire Repairs*, it states,**

> *Driving on an improperly repaired tire is dangerous.  An improper repair can cause further damage to the tire.  It may suddenly fail, <u>causing serious personal injury or death</u>.*
> **Did I read that correctly?**
>
> **A  Correct.**
>
> **Q  And is that knowledge held by BFRC in 2005, when the repairs we've been talking about here today were done?**
>
> **A  Correct.**
>
> **Q  In fact, have you known that the entire time you been with BFRC?**
>
> **A  Yes.**

**(Sheridan deposition, Pgs. 78-79)**

The defendants cannot and do not dispute that plug-only tire repairs fall below the applicable standard of care and carry a known risk of death.

As the court knows in an action brought under the Alabama Wrongful Death Statute (Ala. Code Section 6-5-410) the sole measure of damages is punitive.  This is of critical importance when undertaking a determination of what discovery the parties are entitled to in this case.  FRCP Rule 26(b)(1) states clearly that:

> . . . parties may obtain discovery regarding any matter, not privileged, that is <u>relevant to the claim or defense of any party,</u> . . . for good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.

(FRCP Rule 26(b)(1), *Emphasis added*).

As the Alabama Pattern Jury Instructions for a Wrongful Death Claim state:

In a suit brought for a wrongful act, omission, or negligence causing death the damages recoverable are punitive and not compensatory. **Damages in this type of action are entirely punitive, imposed for the preservation of human life and as a deterrent to others to prevent similar wrongs. The amount of damages should be directly related to the amount of wrongdoing on the part of the defendant(s).** In assessing damages you are not to consider the (pecuniary) (monetary) value of the life of the decedent, for damages in this type of action are not recoverable to compensate the family of the deceased from a (pecuniary) (monetary) standpoint on account of (his) (her) death, nor to compensate the plaintiff for any financial or pecuniary loss sustained by (him) (her) or the family of the deceased on account of (his) (her) death.

Your verdict should not be based on sympathy, prejudice, passion or bias, but should be **directly related to the culpability of the defendant(s) and necessity of preventing similar wrongs in the future.**

(APJI 11.18, *emphasis added*).

The evidence which is the subject of this Motion to Compel goes directly to the defendants' knowledge and notice of other substandard tire repairs being conducted at their stores. The existence of this knowledge and what, if anything, defendants did as a result thereof is direct evidence of the *"Amount of wrongdoing on the part of the defendants,"* the *"culpability of the defendants,"* and what amount of damages are necessary to prevent *"similar wrongs in the future."* (APJI 11.18). Given that the sole measure of damages in this case is the wrongdoing of the defendant and the necessity of preventing the death of others similarly situated to Sandra Pitts, plaintiff has a right to discovery of any and all information which may have provided notice to BFRC that its stores were performing "plug-only" or

6

"string-only" repairs and that therefore their institutional controls were inadequate. The defendants cannot reasonably dispute that under the applicable law the plaintiff is entitled to this discovery.

## **LEGAL ANALYSIS**

1.    **Evidence of other negligent tire repairs and defendants notice thereof is directly relevant to plaintiff's claims.**

Evidence that the defendants had notice of other negligent tire repairs at BFRC's stores is unquestionably relevant to plaintiff's Alabama Wrongful Death claim for the defendants' negligence in repairing Sandra Pitts's tire.  Relevant evidence is defined by FRCP Rule 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  The question of whether evidence is relevant cannot be decided without considering the substantive law on which the claims and defenses of the parties are based.  As excerpts from the Alabama Pattern Jury Instructions above state, damages in an Alabama wrongful death case are directly related to the culpability of the defendants and the necessity of preventing similar wrongs in the future.  Clearly, evidence of whether the defendants had notice of other incidents wherein their facilities were negligently repairing tires and their efforts or lack thereof in addressing that known hazard is relevant to the defendant's culpability and the damages required to deter future conduct and protect human life.

The Supreme Court of Alabama has explicitly ruled that similar evidence is relevant and admissible with respect to a wantonness claim brought pursuant to Alabama substantive law. In Harco Drugs, Inc. v. Holloway, 669 So. 2d 878 (Ala. 1995) plaintiff brought claims for personal injury caused by the defendant pharmacy chain's negligence and wantonness in improperly filling her prescription. The Harco plaintiff introduced evidence of other improperly filled prescriptions by the defendant's pharmacies and the defendant company's notice thereof. The jury returned a verdict for the plaintiff on her wantonness count. On appeal the defendant challenged the trial court's decision to allow this evidence. The Supreme Court of Alabama affirmed stating that:

> As to the second issue, we note that the jury was also informed of 233 incident reports that had been prepared by Harco employees during the three years preceding the incident involving Ms. Holloway. Those reports dealt in some way or another with customer complaints of errors on the part of Harco employees in filling prescriptions, and the vast majority of them indicated that Harco employees had committed errors in filling prescriptions. This evidence, in addition to the evidence of complaints filed with the State Board of Pharmacy and the evidence of lawsuits filed alleging that Harco employees had misfiled prescriptions, **was relevant to show Harco's knowledge of problems within its pharmacies and, thus, was admissible in connection with the wantonness claim, predicated upon Harco's having <u>failed to initiate sufficient institutional controls</u> over the manner in which prescriptions were filled.** (<u>Id</u>. at 881 *emphasis added*).

This evidence which the Alabama Supreme Court deemed admissible because of its relevance to the Harco plaintiff's wantonness claim under Alabama

substantive law is even more directly relevant in this matter where the Alabama Wrongful Death Act (punitive damages only) is involved and the sole measure of damages is the culpability of the defendants and the necessity of preventing similar wrongs. As in <u>Harco</u> evidence concerning the existence and effectiveness of the defendants' "institutional controls" is of direct relevance and is clearly admissible let alone discoverable.

**2.   Plaintiff is unquestionably entitled to the *discovery* of information concerning other negligent tire repairs performed by the defendants.**

As FRCP Rule 26(b)(1) states, "relevant information need not be admissible at the trial if discovery appears reasonably calculated to lead to the discovery of admissible evidence." In the commentary to the 2000 amendment of Rule 26(b)(1) it states that "a variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. <u>For example, other incidences of the same type,</u> or involving the same product, could be properly discoverable under the revised standard." (*Emphasis added*).

The Eleventh Circuit has held explicitly that these other incidents are discoverable and that the failure to allow plaintiff's access to the same is an abuse of the trial court's discretion. In <u>Weeks v. Remington Arms Company,</u> 733 F.2d 1485 (11th Cir. 1984) plaintiff appealed the trial court's refusal to order the defendants produce discovery of other similar accidents involving the rifle at issue

in that case. The trial court in Weeks ordered an in camera production but refused

plaintiff's access to materials concerning other similar accidents. (Id. at 1491).

In deciding the case the Eleventh Circuit made clear the general rule as to

the admissibility of similar acts in evidence:

> In this appeal, Remington does not seriously dispute the admissibility of its records concerning other failures of its safety mechanism; nor could it. **The relevancy of similar accident evidence has been firmly established in this circuit:**
>
> > **Evidence of similar accidents might be relevant to the defendant's <u>notice</u>,** magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, strength of a product, the standard of care, and causation.
>
> Id. at 149, *citing* <u>Ramos v. Liberty Mutual Insurance Co.</u>, 615 F.2d 334, 338-39 (5th Cir. 1980) (citations omitted), cert. denied, 449 U.S. 1112, 101 S. Ct. 921, 66 L. Ed. 2d 840 (1981), *emphasis added*).

After discussing the substantial similarity requirement, which applies to the

*admissibility* not *discoverability* of evidence, the court noted that:

> In this case, Weeks was allowed no opportunity to establish substantial similarity of conditions because the district court refused to grant him access to Remington's records. . . . **We hold, that under these circumstances, the district court abused its discretion by refusing Weeks access to Remington's files.** In any subsequent trial of this matter, Weeks is entitled to Remington's records of other similar failures by its safety mechanism.
>
> (Id. at 1491-1492, *emphasis added*).

Clearly the plaintiff has a right to examine information in the defendants'

possession, custody or control concerning other similar accidents which may have

provided notice to the defendants of a deadly hazard to which they were subjecting their customers.

In response to plaintiff's requests defendants argue that if, as they contend, no complaints or lawsuits concerning negligent tire repairs were ever received by the subject store at which Sandra Pitts's tires were fixed that "it is unclear how repairs made by other technicians at other stores are relevant to a repair allegedly made at the subject store and the alleged subsequent failure of the subject tire." (*See* May 11, 2007 correspondence from defendants' counsel attached hereto as **Exhibit D.**) This contention is without merit in light of the Alabama Supreme Court's holding in <u>Harco</u> discussed above. The defendants own over 2000 stores and have the affirmative duty to have in place adequate institutional controls, policies and procedures to protect their customers. Each store is not an island unto itself; they are all owned and controlled by BFRC and its Bridgestone/Firestone parents. BFRC should not be allowed the benefits of being a huge player in its market while disclaiming the responsibility and legal duty which that size entails.

3. **Defendants reliance on <u>Philip Morris USA v. Williams</u>, 127 S. Ct. 1057 (2007) is completely misplaced as plaintiff does not intend to offer this evidence for the impermissible purposes specified in <u>Williams</u> and because <u>Williams</u> does not deal with the *discoverability* of said evidence but rather its permissible *use* by the jury.**

In plaintiff's attempt to resolve this discovery dispute without seeking the court's assistance plaintiff pointed out to defendants that the claims and defenses in

11

this action, as provided by Alabama substantive law, necessarily control the scope of discovery. (*See* plaintiff's counsel's correspondence dated April 27, 2007, attached hereto as **Exhibit E**). In response defendants rejected this sound and undisputed legal principal and misapply recent United States Supreme Court precedent in their attempt to avoid production of these materials. Footnote 1 to defense counsel's letter of May of 11, 2007 states:

> We disagree with your reliance on APJI Civil 11.18. That pattern jury instruction does not define the scope of discovery in this case. It is clear that a damages award based even in part upon a jury's desire to punish a defendant for "wrongs" inflicted on parties not before the court would amount to an unconstitutional taking without due process. See, e.g. Philip Morris USA v. Williams, - U.S. - , 127 S. Ct. 1057 (2007). Thus, your suggestion that damages in this case somehow hinge upon "wrongs" you believe BFRC may have committed elsewhere is misplaced.

Even a cursory reading of the <u>Williams</u> decision proves that the Supreme Court's holding in that case is completely inapplicable to the discovery at issue here. <u>Williams</u> was an Oregon case filed by the estate of a cigarette smoker against the defendant cigarette manufacturer. The jury found against the defendant manufacturer and awarded the plaintiff significant punitive damages. (<u>Id</u>. at 1061). Philip Morris appealed on the grounds that the trial court refused to give its proposed jury instruction that the jury was not allowed to punish Philip Morris for injury to other smokers not parties to that action. (<u>Id</u>.) It was the failure to give this jury instruction which the <u>Williams</u> court determined violated the Constitution's Due Process Clause. The case did not hold that evidence of other

12

harms was inadmissible and certainly no reading of the opinion could ever lead one

to conclude that it supports these defendants' arguments that the plaintiff is not

entitled to discovery of such information.    The following excerpt from the

Williams opinion makes this clear to conclusion:

> Respondent argues that she is free to show harm to other victims
> because it is relevant to a different part of the punitive damages
> constitutional equation, namely, reprehensibility.  That is to say,
> harm to others shows more reprehensible conduct **Philip Morris, in turn,
> does not deny that a plaintiff may show harm to others in order to
> demonstrate reprehensibility.  Nor do we.  Evidence of actual
> harm to nonparties can help to show that the conduct that
> harmed the plaintiff also posed a substantial risk of harm to the
> general public, and so was particularly reprehensible** – although
> counsel may argue in a particular case that conduct resulting in no
> harm to others nonetheless posed a grave risk to the public, or the
> converse.  Yet for the reasons given above, a jury may not go further
> than this and use a punitive damages verdict to punish a defendant
> directly on account of harms it is alleged to have visited on
> nonparties.

(Id. at 1063 to 1064, *emphasis added*).

Clearly any argument that the Williams decision somehow precludes

plaintiff's discovery of other negligent repairs in this case is not based on the

holding of the Williams case or any other applicable precedent.

**4.    Defendants' argument that production of this material would be unduly
burdensome in this wrongful death action is inappropriate and is
contradicted by the clear weight of authority.**

Defendants claim that they should not be required to produce these materials

on the grounds that, although they receive lawsuits and their individual retail

locations receive complaints, they do not organize their lawsuit files by type of claim and their individual locations do not forward complaints to a central location and, therefore it would be unduly burdensome to make them undertake such a search. (*See* defendants' counsel's letter of May 11, 2007 attached hereto as **Exhibit D**). Judge Carroll addressed this very issue in the case Baine v. General Motors, 141 F.R.D. 328, Ala. M.D. 1991.

In Baine General Motors refused to produce materials evidencing the performance of devices similar to the device at issue in that case. Although General Motors produced a great deal more evidence of the burden of producing the evidence at issue in that case than defendants have described here, Judge Carroll dispensed with that argument in the following portion of his opinion which provides an excellent summary of the applicable authorities:

> The law applicable to an objection to production on grounds of burdensomeness and expense is fairly clear. **The mere fact that producing documents would be burdensome and expensive and would interfere with party's normal operations is not inherently a reason to refuse an otherwise legitimate discovery request.** Biliske v. American Livestock Ins. Co., 73 F.R.D. 124 (W.D. Okla 1977); Keco Indus., Inc. v. Stearns Elec. Corp., 285 F. Supp. 912 (E.D. Wis. 1968); Speedrack, Inc. v. Baybarz, 43 F.R.D. 254 E.D. Cal. 1968; [**10] Technograph, Inc. v. Texas Instruments, Inc., 43 F.R.D. 416 (S.D.N.Y. 1967); Rockaway Pix Theatre, Inc. v. Metro-Goldwyn-Mayer, Inc., 36 F.R.D. 15 (E.D.N.Y. 1964). Scholarly authority clearly perceives the relationship between the enormity of a corporation like General Motors and the paper shield it can erect to discovery. As one treatise has expressed it, **"The fact that defendant's size requires it to keep a great amount of records**

**cannot give it immunity which a small organization would not possess."** 4A Moore's Federal Practice § 34.19 n.10.

**Nor can the lack of an adequate filing system insulate a party from discovery.** For example, in <u>Baxter v. Travenol Labs., Inc., v. LeMay</u>, 93 F.R.D. 379 (S.D. Ohio 1981), plaintiff opposed discovery on the grounds that producing 800,000 sales invoices would require it to search almost 3,000,000 documents. The cost, it was asserted would be some $80,000, and "hundreds of man-hours." The court ruled that an unwieldy recording keeping system could not be used to frustrate discovery. Accord <u>Alliance to End Repression v. Rochford</u>, 75 F.R.D. 441 (N.D. Ill. 1977). Similarly, in [**11] <u>Kozlowski v. Sears Roebuck & Co.</u>, 73 F.R.D. 73 (D. Mass. 1976), the court found that a corporation that maintained its records in such a way as to make document retrieval totally impracticable could not use this impracticability as grounds to defend against production. **Accordingly, when plaintiff sought disclosures of complaints similar to her own against the company, the company was not permitted to interpose a defense to production that the indexing of the documents was not conducive to a subject-matter search.**

(<u>Id</u>. at 331, *emphasis added*).

Clearly there can be no dispute that burdensomeness which is the result of the defendants' method of recordkeeping is no excuse for withholding clearly relevant information. To the extent defendants argue that such materials do not evidence notice of negligent tire repairs because their recordkeeping is such that the defendants do not even look at these complaints themselves then this evidences an even greater degree of culpability in that the defendants have deliberately turned a blind eye to such problems.

In Plaintiff's correspondence of April 27, 2007, attached hereto as **Exhibit E** wherein an attempt was made to resolve this discovery matter, plaintiff's counsel

offered to make reasonable accommodation so as to lessen "the burden and expense to the defendants in making such materials available." In rejecting plaintiff's request for these materials defendants did not address plaintiff's proposal.

Respectfully Submitted,

Lanny S. Vines    (VIN 002)

Robert P. Bruner    (BRU 029)

Attorneys for the Plaintiff

**OF COUNSEL:**
Lanny S. Vines, Esq.
Robert P. "Bo" Bruner, Esq.
**LANNY VINES & ASSOCIATES, LLC**
2142 Highland Avenue South
Birmingham, Alabama 35205-4002
Tel:  205-933-1277
Fax:  205-933-1272

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Lanny S. Vines, Esq.
Robert P. "Bo" Bruner, Esq.
LANNY VINES & ASSOCIATES, LLC
2142 Highland Avenue South
Birmingham, Alabama 35205-4002

Brittin T. Coleman
Kenneth M. Perry
Hope T. Cannon
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104

and I hereby certify that I have mailed by United States Postal Service the foregoing to the following non-CM/ECF participants:

None

OF COUNSEL

# EXHIBIT A

**Customer Invoice**
046642
02/26/2005

**FIRESTONE TIRE & SERVICE CENTERS**
**MADISON AVENUE**
**321 MADISON AVE**
**MONTGOMERY, AL. 36104**

Service Advisor:
01 W
334.264.5301

PITTS, SANDRA
140 COLLINGWOOD AVE
MONTGOMERY, AL  36105
334.288.5314

2001 CHEVROLET BLAZER
V6-262 4.3L
Lic #: 3B134EC AL   Vin #:
In:  02/26/05 10:43AM   Mileage:  39,599
Out: 02/26/05 11:38AM

Store # 020060

### RETAIL SALE

| Description | Article Number | ID | Qty | Unit Price | Extended Price | Job Total |
|---|---|---|---|---|---|---|
| MASTERCARE STANDARD OIL CHANGE - UP TO 5 QUARTS | | 01 | | | | 14.99 |
| TF47 OIL FILTER | 7058122 | 20 | 1 | 3.99 | 3.99 | |
| OIL (QUART) | 7017515 | 20 | 5 | 1.75 | 8.75 | |
| OIL CHANGE LABOR | 7029718 | 20 | 1 | 7.25 | 7.25 | |
| OIL/FILTER DISPOSAL FEE (1) | 7075051 | 20 | 1 | 2.00 | 2.00 | |
| PARTS DISCOUNT MASTERCARE STANDARD OIL CHANGE - UP TO 5 QUARTS | 7001674 | 20 | -1 | 4.06 | 4.06 | |
| LABOR DISCOUNT MASTERCARE STANDARD OIL CHANGE - UP TO 5 QUARTS | 7001674 | 20 | -1 | 2.94 | 2.94 | |
| COURTESY CHECK | | 01 | | | | |
| COURTESY CHECK | 7046930 | 20 | 1 | N/C | N/C | |
| : BELTS : | | 01 | | | | 51.99 |
| 950K6 POLY - RIB BELT | 7090336 | 12 | 1 | 27.99 | 27.99 | |
| REMOVE & REPLACE ALTERNATOR DRIVE BELT | 7020729 | 12 | 1 | 24.00 | 24.00 | |
| TIRE REPAIR - WHEEL REMOVAL (Rear-Left) | | 01 | | | | 12.99 |
| FLAT REPAIR - PATCH-PLUG | 7020060 | 20 | 1 | 1.99 | 1.99 | |
| FLAT REPAIR LABOR | 7019488 | 20 | 1 | 11.00 | 11.00 | |

**Technician(s):**
12: K YOUNG            20  P CLEMONS

Payment History:

Check       4215             86.01
Total Tendered            86.01

| Summary: | |
|---|---|
| Parts | 38.66 |
| Labor | 41.31 |
| Shop Supplies | 2.40 |
| Sub-Total | 82.37 |
| Tax (10.00%) | 3.64 |
| **Total** | **$86.01** |

I have received the above goods and/or services. If this is a credit
card purchase, I agree to pay and comply with my cardholder
agreement with the issuer.

_____
Customer Signature

**Revision History:**
02/26/2005  11:11AM 334.288.5314 PITTS, SANDRA

Rev
Amt Init
70.27

Initial here to indicate you have received the
Tire Maintenance Warranty Book.
**All parts are new unless otherwise specified.**

I acknowledge notice and oral approval of
an increase in the original estimated price.

_____
Signature or Initials

Inv1 N041021

| Customer Invoice | FIRESTONE TIRE & SERVICE CENTERS | Service Advisor: |
|---|---|---|
| 054515 | MADISON AVENUE | 01 W |
| 12/10/2005 | 321 MADISON AVE | 334.264.5301 |
| | MONTGOMERY, AL  36104 | |

PITTS, SANDRA
140 COLLINGWOOD AVE
MONTGOMERY, AL  36105
334.288.5314

2001 CHEVROLET BLAZER
V6-262 4.3L
Lic #: 3B134EC  AL    Vin #:
In:  12/10/05  10:48AM    Mileage:  48,856
Out:  12/10/05  11:13AM

Store # 020060

RETAIL SALE

| Description | Article Number | ID | Qty | Unit Price | Extended Price | Job Total |
|---|---|---|---|---|---|---|
| MASTERCARE STANDARD OIL CHANGE - UP TO 5 QUARTS | | 01 | | | | 16.99 |
| TP47 OIL FILTER | 7058122 | 12 | 1 | 3.99 | 3.99 | |
| OIL CHANGE LABOR | 7029718 | 12 | 1 | 9.00 | 9.00 | |
| USED FILTER RECYCLING CHARGE | 7075051 | 12 | 1 | 2.50 | 2.50 | |
| 10W30 GT-1 SYNTHETIC BLEND OIL | 7017515 | 12 | 5 | 2.00 | 10.00 | |
| PARTS DISCOUNT MASTERCARE STANDARD OIL CHANGE - UP TO 5 QUARTS | 7001674 | 12 | 1 | 4.67 | 4.67 | |
| LABOR DISCOUNT MASTERCARE STANDARD OIL CHANGE - UP TO 5 QUARTS | 7001674 | 12 | 1 | 3.83 | 3.83 | |

INSPECTION
  CUSTOMER REQUESTED NO INSPECTION

Technician(s):
  12  K-YOUNG

Payment History:
  Cash Tendered          20.00
Total Tendered           20.00
Change Due                2.57

| Summary | |
|---|---|
| Parts | 9.32 |
| Labor | 7.67 |
| Shop Supplies | 0.00 |
| Sub-Total | 16.99 |
| Tax (10.00%) | 0.44 |
| Total | $17.43 |

I have received the above goods and/or services. If this is a credit
card purchase, I agree to pay and comply with my cardholder
agreement with the issuer.

_____
       Customer Signature

*All parts are new unless otherwise specified.*

See reverse side for Warranty Information
COMMITTED TO PROVIDING A POSITIVE CUSTOMER EXPERIENCE

# LIMITED WARRANTY
## MasterCare® Service & Parts

**WHAT IS WARRANTED AND FOR HOW LONG?** Auto parts purchased at any Firestone Tire and Service Center location are warranted to be free from def for a period of six (6) months or 6,000 miles, whichever comes first, and all auto service work performed at such location is warranted for the same pe Some parts and services are warranted for longer periods as listed below. Tires and batteries are warranted separately and not covered by this warranty. warranty applies to parts installed and service performed on private passenger cars and light trucks.

**"MasterCare® Triple Guarantee"**
This MasterCare® Triple Guarantee is given by Bridgestone/Firestone, Inc. It is only offered through participating company-owned Firestone MasterCare® stores.

**Price Match Guarantee:**
**Tires:** This Price Match Guarantee extends to the Customer within thirty (30) days after the date of purchase, a 150% refund of the difference between a lower locally-advertised lower price on a similar make/model tire and the price of a tire purchased from a Firestone Tire and Service Center. Customer must produce local ad. This guarantee excludes clearances, closeouts and catalogs. This refund may not be combined with any other offer or used to reduce outstanding debt. **Service:** Firestone Tire and Service Centers will match any comparable service advertisement and/or bona fide service estimate. Service is defined as p and labor. Customer must provide a current local ad or a comparable current written service estimate.

**Fixed Right Guarantee:**
This limited warranty extends to the Customer the option of a refund of the Customer's money for the specific service work performed by us which prove have been improperly performed during the six (6) month automobile warranty period. It the automotive repair or service is improperly performed, then at the customer's option, re-perform the work at no additional charge for parts or labor (except as noted in the "Exclusions" below) or, at the Customer's option, refund the Customer's money for the specific service work performed by us. This refund is not to be combined with any other offer or to reduce outstanding debt.

**On Time Guarantee:**
This On Time Guarantee extends to the Customer a 10% discount on the total of parts and labor off their next visit to any company-owned Firestone locati if the store fails to complete tire and/or service work within the time promised, as agreed upon prior to completion of tire and/or service work performed subsequent second visit must occur within one year of the original service. Minimum discount is $5.00 and maximum discount is $20.00. This discount to be combined with any other offer or to reduce outstanding debt.

Auto parts which prove to be unserviceable during the warranty period, except as identified below, will be replaced free of any additional charge for parts exc except as noted under "Exclusions", below.

| LIMITED WARRANTY ON: | PARTS | LABOR |
|---|---|---|
| Steering & Suspension Parts | Lifetime | 6 Months / 6,000 Miles |
| Universal Joints (Excluding CV Joints & Boots) | Lifetime | 6 Months / 6,000 Miles |
| Performance Gas Shock | Lifetime | Lifetime |
| Gas Truck Shock (1) | Lifetime (1) | Lifetime (1) |
| Performance Gas MacPherson Strut or Cartridge | Lifetime | Lifetime |
| New or Remanufactured Starters and Alternators | 24 Months / 24,000 Miles | 6 Months / 6,000 Miles |
| MasterCare® Premium Brake Service - Brake Shoes, Disc Pads, Calipers and /or Wheel Cylinders, brake installation hardware (2) Service Includes: Brake System Flush and Clean/Adjust Rear Axle (3) | Lifetime (2) 24 Months / 24,000 Miles (3) | Lifetime (2) 24 Months / 24,000 Miles (3) |
| MasterCare® Plus Brake Service - Brake Shoes, Disc Pads (2) Service Includes: Brake System Flush and Clean /Adjust Rear Axle | Lifetime (2) 24 Months / 24,000 Miles (3) | Lifetime (2) 24 Months / 24,000 Miles (3) |
| MasterCare® Standard Brake Service - Brake Shoes, Disc Pads | 12 Months / 12,000 Miles | 12 Months / 12,000 Miles |
| MasterCare® Plus T/A or 4-Wheel Alignment Service Includes: Tire Rotation and Four Wheel Balance (4) | 12 Months / 12,000 Miles (4) | 12 Months / 12,000 Miles (4) |
| MasterCare® Premium T/A or 4-Wheel Alignment Service Includes: Tire Rotation and Four Wheel Balance (4) | Lifetime (4) | Lifetime (4) |
| MasterCare® Plus Tune-Up - 4, 6, or 8 Cylinder Service Includes: Bosch Platinum 2 Spark Plugs and Fuel System Cleaning | 12 Months / 12,000 Miles | 12 Months / 12,000 Miles |
| MasterCare® Premium Tune-Up - 4, 6, or 8 Cylinder Service Includes: Bosch Platinum 2 Spark Plugs, Fuel Filter, Fuel System Cleaning and Air Filter | 24 Months / 24,000 Miles | 24 Months / 24,000 Miles |
| MasterCare® Premium Wheel Balance (4) | Lifetime (4) | Lifetime (4) |

ALL LIFETIME WARRANTIES ARE ONLY VALID FOR AS LONG AS THE ORIGINAL CUSTOMER OWNS THE VEHICLE.
(1) Performance Gas Truck Shocks, installed on a commercial use vehicle, are also warranted against defects and wear-out for 1 year from date of purchas or 100,000 miles, whichever occurs first; labor included.
(2) Costs of additional brake system components, including master cylinders, rotors, drums and all additional labor, are warranted for a period of six (6) month or 6,000 miles, whichever comes first, but are not included in the Lifetime, 24 month/24,000 mile, or 12 month/12,000 mile warranties.
(3) Costs of brake system flush/adjust rear axle is only warranted for 24 months/24,000 miles with MasterCare Premium Brake service.
(4) Lifetime balance is only warranted as long as originally balanced tire remains on wheel.

**Exclusions:** Replacement of anti-freeze or clamps is not included in the warranty on belts/radiator hoses. Cost of refrigerant and recharging of the air conditioner system is not included in the warranty on air conditioner parts or air conditioner compressors. Cost of additional brake system components, including rotors and drums and or labor to restore Brake System to its safe proper operation is not included with the warranty on Brake Shoes, Disc Pads, Calipers and/or Wheel Cylinders and all other hardware. Batteries are covered by a separate warranty from the manufacturer.

### GENERAL PROVISIONS (Applicable to all warranties)
**WHO IS COVERED BY THE WARRANTIES LISTED IN THIS DOCUMENT?** This warranty covers only the original purchaser of the installed parts and/or service.
**WHERE WILL THE WARRANTIES BE HONORED?** Take your car to the Firestone Tire & Service Center which sold the warranted parts and/or service work, or any other Firestone Tire & Service Center, or a participating authorized Dealer location in the United States.
**HOW CAN A CLAIM BE MADE UNDER THE WARRANTIES?** The original invoice from the store at which the original work was performed must be presented order to get the benefit of the warranty.
**WHAT OTHER CONDITIONS APPLY?** The obligations undertaken in these warranties are offered only on the above terms and conditions, and may not be enlarge or altered by anyone. This warranty document does not apply to products or vehicles used for commercial, racing, or off-road purposes, or to damage cause by abuse or accident. **TO THE EXTENT PERMITTED BY LAW, BSF RETAIL & COMMERCIAL OPERATIONS, LLC., INC., AND ITS FIRESTONE TIRE SERVICE CENTER LOCATIONS DISCLAIM LIABILITY FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES.** Some states do not allow the exclusion o limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.
**CONSUMER RIGHTS:** This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.
GIVEN BY: Firestone Tire & Service Center identified in stamp or, if none, by **Bridgestone/Firestone North American Tire, LLC.,** 535 Marriott Drive, Nashville TN 37214.

Your satisfaction is important to us. If for any reason, you are not satisfied with the service you receive, contact the Manager of the store where your servic was provided. If you feel your problem has not been handled to your complete satisfaction, or you need the address of the Firestone Tire & Service Centers neares you, please call Firestone Consumer Affairs, 1-800-367-3872.

FIRESTONE MASTERCARE LABEL (REV. 01-2003 E)(REV. 02-06

**Customer Invoice**
054623
12/15/2005

**FIRESTONE TIRE & SERVICE CENTERS**
**MADISON AVENUE**
**321 MADISON AVE**
**MONTGOMERY, AL  36104**

**Service Advisor:**
05  DAVID
334.264.5301

2001 CHEVROLET BLAZER
V6-262 4.3L

PITTS, SANDRA
140 COLLINGWOOD AVE
MONTGOMERY, AL  36105
334.288.6314

Lic #: 3B134EC  AL    Vin #:
In:   12/15/05  8:20AM    Mileage:  49,067
Out:  12/15/05  10:04AM

Store # 020060

RETAIL SALE

| Description | Article Number | ID | Qty | Unit Price | Extended Price | Job Total |
|---|---|---|---|---|---|---|
| TIRE REPAIR - WHEEL REMOVAL (Front-Right) | | 05 | | | | 14.99 |
| FLAT REPAIR - PATCH-PLUG | 7020060 | 20 | 1 | 2.99 | 2.99 | |
| FLAT REPAIR LABOR | 7019488 | 20 | 1 | 12.00 | 12.00 | |
| COURTESY CHECK | | 05 | | | | |
| COURTESY CHECK | 7046930 | 20 | 1 | N/C | N/C | |

**Technician(s):**
20 - P. CLEMONS

**Payment History:**

| | | **Summary:** | |
|---|---|---|---|
| Cash Tendered | 20.28 | Parts | 2.99 |
| Total Tendered | 20.28 | Labor | 12.00 |
| Change Due | -5.00 | Shop Supplies | 0.00 |
| | | Sub-Total | 14.99 |
| | | Tax (10.00%) | 0.29 |
| | | Total | $15.28 |

I have received the above goods and/or services. If this is a credit
card purchase, I agree to pay and comply with my cardholder
agreement with the issuer.

_____
Customer Signature

*All parts are new unless otherwise specified.*

See reverse side for Warranty Information

COMMITTED TO PROVIDING THE CUSTOMER EXPERIENCE

# LIMITED WARRANTY
## MasterCare® Service & Parts

**WHAT IS WARRANTED AND FOR HOW LONG?** Auto parts purchased at any Firestone Tire and Service Center location are warranted to be free from de for a period of six (6) months or 6,000 miles, whichever comes first, and all auto service work performed at such location is warranted for the same pe Some parts and services are warranted for longer periods as listed below. Tires and batteries are warranted seperately and not covered by this warranty. warranty applies to parts installed and service performed on private passenger cars and light trucks.

### "MasterCare® Triple Guarantee"
This MasterCare® Triple Guarantee is given by Bridgestone/Firestone, Inc. It is only offered through participating company-owned Firestone MasterCare® store

**Price Match Guarantee:**
**Tires:** This Price Match Guarantee extends to the Customer, within thirty (30) days after the date of purchase, a 150% refund of the difference between a ta locally-advertised lower price on a similar make/model tire and the price of a tire purchased from a Firestone Tire and Service Center. Customer must prov current local list... This guarantee excludes clearance, closeouts and catalogs. This refund may not be combined with any other offer or used to reduce outsta debt. **Service:** Firestone Tire and Service Centers will match any comparable service advertisement or bona fide service estimate. Service is defined as end labor. Customer must provide a current local or a comparable current written service estimate.

**Fixed Right Guarantee:**
This limited warranty extends to the Customer the option of a refund if the Customer's money for the specific service work performed by us which prove have been improperly performed during the six (6) month and/or 6,000 mile warranty period. If the automotive repair or service is improperly performed wi at the Customer's option, re-perform the work at no additional charge for parts or labor (except where normal maintenance is recommended). Alternatively, at the C option, refund the Customer's money for the specific service work performed by us. This refund is not to be combined with any other offer or to reduce outsta debt.

**On Time Guarantee:**
This On Time Guarantee extends to the Customer a 10% discount on the total of parts and labor off their next visit to any company-owned Firestone locat if the store fails to complete tire and/or service work within the time promised, as agreed upon prior to completion of tire and/or service work performed subsequent second visit (used within one year of the original service). Minimum discount is $5.00 and maximum discount is $45.00. This discount is to be combined with any other offer or to reduce outstanding debt.

Auto parts which prove to be unserviceable during the warranty period, except as identified below, will be replaced free of additional charge for parts or la except as noted under "Exclusions", below.

| LIMITED WARRANTY ON: | PARTS | LABOR |
|---|---|---|
| Steering & Suspension Parts | Lifetime | 6 Months / 6,000 Miles |
| Universal Joints (Excluding CV Joints & Boots) | Lifetime | 6 Months / 6,000 Miles |
| Performance Gas Shock | Lifetime | Lifetime |
| Gas Truck Shock (1) | Lifetime (1) | Lifetime (1) |
| Performance Gas MacPherson Strut or Cartridge | Lifetime | Lifetime |
| New or Remanufactured Starters and Alternators | 24 Months / 24,000 Miles | 6 Months / 6,000 Miles |
| MasterCare® Premium Brake Service: Brake Shoes, Disc Pads, Calipers and /or Wheel Cylinders, brake installation hardware (2) Service Includes: Brake System Flush and Clean/Adjust Rear Axle (3) | Lifetime (2) 24 Months / 24,000 Miles (3) | 24 Months / 24,000 Miles (2) 24 Months / 24,000 Miles (3) |
| MasterCare® Plus Brake Service: Brake Shoes, Disc Pads (2) Service Includes: Brake System Flush and Clean/Adjust Rear Axle | Lifetime (2) 24 Months / 24,000 Miles | 24 Months / 24,000 Miles (2) 24 Months / 24,000 Miles |
| MasterCare® Standard Brake Service: Brake Shoes, Disc Pads | 12 Months / 12,000 Miles | 12 Months / 12,000 Miles |
| MasterCare® Plus T/A or 4-Wheel Alignment Service Includes: Tire Rotation and Four Wheel Balance (4) | | 12 Months / 12,000 Miles (4) |
| MasterCare® Premium T/A or 4-Wheel Alignment Service Includes: Tire Rotation and Four Wheel Balance (4) | | Lifetime (4) |
| MasterCare® Plus Tune-Up - 4, 6, or 8 Cylinder Service Includes: Bosch Platinum 2 Spark Plugs and Fuel System Cleaning | 12 Months / 12,000 Miles | 12 Months / 12,000 Miles |
| MasterCare® Premium Tune-Up - 4, 6, or 8 Cylinder Service Includes: Bosch Platinum 2 Spark Plugs, Fuel Filter, Fuel System Cleaning and Air Filter | 24 Months / 24,000 Miles | 24 Months / 24,000 Miles |
| MasterCare® Premium Wheel Balance (4) | Lifetime (4) | Lifetime (4) |

**ALL LIFETIME WARRANTIES ARE ONLY VALID FOR AS LONG AS THE ORIGINAL CUSTOMER OWNS THE VEHICLE.**
(1)  Performance Gas Truck Shocks, installed on a commercial use vehicle, are also warranted against defects and wear-out for 1 year from date of purchas or 100,000 miles, whichever occurs first, labor included.
(2)  Costs of additional brake system components, including master cylinders, rotors, drums and all additional labor, are warranted for a period of six (6) month of 6,000 miles, whichever comes first, but are not included in the Lifetime, 24 month / 24,000 mile, or 12 month / 12,000 mile warranties.
(3)  Costs of brake system flush/adjust rear axle is only warranted for 24 months/24,000 miles with MasterCare Premium Brake service.
(4)  Lifetime balance is only warranted so long as originally balanced tire remains on wheel.

**Exclusions:** Replacement of anti-freeze or clamps is not included in the warranty on belts/radiator hoses. Cost of refrigerant and recharging of the air conditioni system is not included with the warranty on air conditioner parts or air conditioner compressors. Cost of additional brake system components, including rotor and drums and/or labor to restore Brake System to its safe proper operation is not included with the warranty on Brake Shoes, Disc Pads, Calipers and/o Wheel Cylinders and all other hardware. Batteries are covered by a seperate warranty from the manufacturer.

### GENERAL PROVISIONS (Applicable to all warranties)
**WHO IS COVERED BY THE WARRANTIES LISTED IN THIS DOCUMENT?** This warranty covers only the original purchaser of the installed parts and/or service
**WHERE WILL THE WARRANTIES BE HONORED?** Take your car to the Firestone Tire & Service Center which sold the warranted parts and/or service work, other Firestone Tire & Service Center, or a participating authorized Dealer location in the United States.
**HOW CAN A CLAIM BE MADE UNDER THE WARRANTIES?** The original invoice from the store at which the original work was performed must be presented order to get the benefit of the warranty.
**WHAT OTHER CONDITIONS APPLY?** The obligations undertaken in these warranties are offered only on the above items and conditions, and may not be enlarge or altered by anyone. This warranty document does not apply to products or vehicles used for commercial, racing, or off-road purposes, or to damage cause by abuse or accident. **TO THE EXTENT PERMITTED BY LAW, BSF RETAIL & COMMERCIAL OPERATIONS, LLC, INC. AND ITS FIRESTONE TIRE SERVICE CENTER LOCATIONS DISCLAIM LIABILITY FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES.** Some states do not allow the exclusion o limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.
**CONSUMER RIGHTS:** This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.
**GIVEN BY:** Firestone Tire & Service Center identified in stamp or, if none, by Bridgestone/Firestone North American Tire, LLC., 535 Marriott Drive, Nashvill TN 37214.

Your satisfaction is important to us. If for any reason, you are not satisfied with the service you receive, contact the Manager of the store where your servic was provided. If you feel your problem has not been resolved to your complete satisfaction, or you need the address of the Firestone Tire & Service Centers neares you, please call Firestone Consumer Affairs, 1-800-367-3872.

# EXHIBIT B



BFS/00544
(Pitts v. BFS)

Tire Resource Manual

# TABLE OF CONTENTS

*Core Tire Knowledge* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

*Tire Care & Maintenance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .91

*Tire Adjustment Procedures* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .167

*Original Equipment Fitment Guides* . . . . . . . . . . . . . . . . . . . . . . . .191

*Load & Inflation Tables* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .219

*How to Read a Product Sheet* . . . . . . . . . . . . . . . . . . . . . . . . . . . .251

*Product Sheets*
    Mass Market Touring . . . . . . . . . . . . . . . . . . . . . . . . . . . . .253
    Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .275
    High Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .281
    Touring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .291
    Ultra High Performance . . . . . . . . . . . . . . . . . . . . . . . . . . .297
    Light Truck Highway . . . . . . . . . . . . . . . . . . . . . . . . . . . . .309
    Light Truck All-Terrain . . . . . . . . . . . . . . . . . . . . . . . . . . . .323
    Light Truck Max-Traction . . . . . . . . . . . . . . . . . . . . . . . . . .335
    Light Truck Commercial Highway . . . . . . . . . . . . . . . . .341
    Light Truck Commercial All-Terrain . . . . . . . . . . . . . . . .347
    Winter Passenger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .353
    Winter Light Truck . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .365

*Technical Bulletins* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .375

BFS/00545
(Pitts v. BFS)

# 2005 TIRE RESOURCE MANUAL

# CORE TIRE KNOWLEDGE

## TABLE OF CONTENTS

Introduction..................................................3
   What Is a Sales Teammate .........................4
   Five Steps To Successful Tire Sales .......................5
   Telephone Techniques To Increase Tire Sales ........8
   Handling Customer Complaints................................9
   Merchandising Tires ................................10
   Inspect All Tires In The Service Department ........10
Tire Categories................................................12
Tire Construction .........................................13
Parts of a Tire ...............................................15
   Tread Components................................18
   Tread Designs.....................................19
Tire Sidewall Information .................................21
Tire and Rim Dimensions ...........................24
Tire Nomenclature .........................................26
Uniform Tire Quality Grading (UTQG)......................28
Load Range and Inflation Limits ..............................30
Performance Tires ...........................................34
   Speed Rating ....................................34
   Service Description ..............................37
   Plus Sizing .......................................38
Light Truck Tires ...........................................40
   Wheel Warnings ................................41
   Rims Approved For Radial Tire Usage .................42

   Light Truck Inflation Procedures............................43
Winter Tires ...............................................44
   Rear Wheel Drive Vehicles......................................45
   Front Wheel Drive Vehicles ....................................45
   Tire Studs/Tire Spinning/Tire Chains.....................47
Innovative Tire Technologies ....................................49
   UNI-T®/UNI-T AQ™ ...................................49
   UNI-T AQII™ ...........................................50
   Winter Tire Technology............................................52
   Run-Flat Technology (RFT) ....................................53
Guidelines For Selection of Replacement Tires .........55
Assisting Customers Maintain Their Tires.................59
   Tire Mounting/Storage/Repairs .........................61
   Tire Mixing ...........................................63
   Proper Inflation Pressure ........................................64
   Tire Rotation ........................................65
   Match Mounting ...................................66
   Tire Serial Number (DOT#) Location......................68
   SEMA Custom Wheel & Tire Specialist Certification....69
   Tire Registration ...................................72
Glossary of Features and Benefits ..........................73
Glossary of Terms ...........................................77
Performance Fitment Formulas ................................89
Weight and Measurement Conversions ..................90

BFS/00546
(Pitts v. BFS)

# 2005 TIRE RESOURCE MANUAL

## TIRE MOUNTING

Always stand well clear of any tire mounting operation. This is especially important when the service operator inflates the tire. If the tire has been improperly mounted, it may burst with explosive forces causing serious personal injury or death.

A new valve stem is recommended when a worn out passenger tire is replaced.

Use valve caps to keep valve cores clean, clear of debris and to help guard against air leakage.

Removing and replacing tires on rims can be dangerous. Attempting to mount tires with improper tools or procedures may result in a tire explosion causing serious personal injury or death. This is a job for a qualified tire service person, following proper procedures.

Serious Personal injury or death can result from:

1. Failure to select the proper tire and rim. The tire must match the width and diameter requirements of the rim. For example, when mounting 16-inch diameter tires, use only 16-inch diameter rims. **When mounting truck type radial tires, use only wheels approved for radial tires.**

2. Failure to inspect both the tire and rim. The rim must be free of cracks, dents, chips, and rust. The tire must be free of bead damage, cuts, and punctures. Do not attempt to repair or seal bead damage. Attempting to use a tire with bead damage can later result in sudden tire failure causing serious personal injury or death.

3. Failure to follow proper procedures. For proper mounting procedures, consult the **Care and Service of Automobile and Light Truck Tires** published by the Rubber Manufacturers Association.

4. Exceeding the maximum bead seating pressure. The tire service person must never inflate a tire beyond 40 pounds per square inch (p.s.i.) (276 kPa) to seat beads. Be absolutely certain beads are fully seated before adjusting inflation pressure to the level recommended for vehicle operation.

## SAFETY WARNING:

Never place a flammable substance into a tire/rim assembly at any time. Never put any flammable substance into a tire/rim assembly and attempt to ignite to seat the beads.

## TIRE STORAGE

Tires should be stored indoors in a cool dry place where water cannot collect inside the tires. The tires should be placed away from electric generators and motors, and sources of heat such as hot pipes. Storage surfaces should be clean and free of grease, gasoline, or other substances that can deteriorate the rubber. Improper storage can damage tires in ways that may not be visible and can lead to serious personal injury or death.

## TIRE REPAIRS

Driving on an improperly repaired tire is dangerous. An improper repair can cause further damage to the tire. It may suddenly fail, causing serious personal injury or death.

Before you repair a tire, make it a point to ask the customer if he or she used an aerosol fixer to inflate/seal the tire. Aerosol fixers could contain a highly volatile gas. Always remove the valve core outdoors, away from sources of excessive heat, flame or sparks and completely deflate the tire before removing it from the rim for repair. Do not use a tire reamer, rasp, plug, or any object, which could cause sparks on a tire or rim without first completely removing the tire from the rim. Never add air to a tire treated with an aerosol fixer without completely removing the flammable gas. If you believe an aerosol fixer has been used, wash the inside of the tire with a detergent/water solution, rinse thoroughly and allow the tire to dry.

## DETERMINE IF THE TIRE IS REPAIRABLE

The tire's ability to be repaired should be judged by the following point:

1. State of wear
2. Location of damage
3. Type of damage
4. Size of damage

**Note:** Tires that are speed-rated may be repaired. However, after repair these tires no longer maintain their speed ratings.

BFS/00547
*(Pitts v. BFS)*

61

## TIRE REPAIR LIMITS

- Never repair a tire with less than 2/32nd inch (1.6 millimeters) tread remaining. At this tread depth, the tire is worn out and must be replaced.
- Never repair a tire with a puncture larger than 1/4 inch (6.4 millimeters) in diameter. Such tires cannot be properly repaired and must be replaced.
- Repairs of all tires (radial and non-radial) must be of the plug and inside patch type. **Using plugs alone on any type of tire is not a safe repair.**
- Never repair a tire with a puncture or other damage outside the tread area. Such tires cannot be properly repaired and must be replaced.
- Any tire repair done without removing the tire from the rim is improper.
- Tubes, like tires, should be repaired only by a qualified tire service person.
- Never use a tube as a substitute for a proper repair.
- Once determined repairable, the tire must be patched from the inside and the puncture area filled. Use tire chalk to mark the position of the valve stem and wheel weights prior to demounting the tire from the rim. By following this simple procedure, the tire can be remounted in its original position (retaining match mounting) and maintains the balance of the tire/rim configuration. If the tire has been driven several thousand miles since the last balance check, you may recommend to the customer that the balance be checked.

The three basic steps for puncture repairing are: (1) Removing the tire from the wheel for inspection and repair, (2) filling the injury to keep moisture out, and (3) sealing the innerliner with a repair unit to prevent air loss.

## INSPECTION

1. Mark injury and remove the puncturing object
2. Before deflating, immerse the entire tire in water to determine if there is more than one hole
3. Remove the tire from the wheel
4. Inspect puncture with a blunt awl to determine the size and type of injury
5. Place the tire on a spreader and inspect thoroughly
6. If any of the following conditions exist, the tire cannot be repaired:
   a. Holes larger than 1/4 inch
   b. Run flat damage
   c. Broken or deformed bead wires
   d. Ruptures of radial plies
   e. Deterioration of rubber
   f. Damage to the bead area

## REPAIR PROCEDURES

1. Remove all foreign matter from the hole. Be careful not to enlarge the hole.

2. Select the proper size reamer. The reamer selection must completely cover the injured area.

3. Select the proper size patch and plug to correspond to the reamer. Center the patch over the puncture and mark one inch beyond the edge of the patch with a crayon.

4. Clean the punctured area thoroughly with a pre-buff chemical cleaner (do no use gasoline).

5. With the tire in a relaxed position and following the tool manufacturer's recommendations, use a proper hand reamer, carbide cutter, or drill bit to clean the injury.

6. Buff thoroughly to a flat, smooth velvet surface, per RMA. "Be careful not to gouge the innerliner or expose casing liner. Remove buffing dust with a vacuum cleaner. Note: chemical cleaning is not a substitute for mechanical buffing."

7. Apply cement recommended by the patch manufacturer according to the label directions. Cement must be allowed to dry thoroughly.

8. Lubricate the hole and taper of plug with cement. Insert the plug into the hole, pulling it firmly through so the patch seats to the buffed innerliner. Be sure the bead marking is in the correct position.

9. Stitch from the center out being careful not to trap any air.

10. Cut off stem 1/16 inch above the outer surface.

11. Check for leaks with a soap solution before returning a tire to service on the vehicle.

12. Mount the repaired tire following the proper mounting procedures.

13. Be certain to check the condition and inflation pressure of all remaining tires on the vehicle.

BFS/00548
(*Pitts v. BFS*)

Failure to follow these recommendations could result in sudden tire failure, property damage, personal injury, or death. Your location should follow these procedures to assure the customer of many safe-driving miles because of your repair. **Using plugs alone on any type of tire is not a safe repair. Therefore, repairs of all tires (radial and non-radial) should be of the plug and inside patch type.**

Failure to follow the procedures and recommendations could result in sudden tire failure, property damage, personal injury or death. Your location should follow all procedures outlined in this certification program to assure the customer of many safe-driving miles because of your repair.



## TIRE CARE AND MAINTENANCE TIPS

This section will help you understand the direct result care and maintenance have on the performance of a tire. A well-maintained tire will perform to the best of its design capabilities. Abnormal wear patterns may develop because of misalignment, overinflation, under-inflation, out of balance, overloading of the vehicle, or worn suspension components. While mechanical service may be required to correct some abnormal tire wear patterns, proper care and maintenance of the tires and vehicle can prevent abnormal tire wear. In order for a tire to be well maintained it must be properly mounted, maintain proper inflation pressure, properly aligned, and be rotated as scheduled.

BFS/00549
*(Pitts v. BFS)*

# TIRE MIXING

Tires of different constructions and sizes may have different handling and/or other performance characteristics. Therefore, note the following:

1. **Unless otherwise specified by the vehicle manufacturer, it is recommended that all tires on a vehicle be the same size, construction (i.e. radial, bias ply), and speed rating.**

2. **Never mix tires of different size or construction on an axle (except for temporary use of a spare).**

Additionally:

- **4x4 and AWD Vehicles:** It is particularly important to match all tire sizes and constructions on four-wheel-drive (4x4) or all-wheel-drive (AWD) vehicles, unless otherwise specified by the vehicle manufacturer.

- **Winter Tires:** Winter tires are best applied to all vehicle positions. If winter tires are applied to the front axle of any vehicle, they *must* also be installed on the rear. Do not apply winter tires to only the front axle–this applies to all passenger cars and light trucks, including front wheel drive, 4x4 and all-wheel drive vehicles.

- **Speed Rating:** Tires with different speed ratings may vary in ride, handling, and/or other performance characteristics. Thus, care should be taken when mixing tires of different speed ratings on the same vehicle. It is the "top speed" of the "slowest" tire on the vehicle which limits the vehicle's top speed without tire failure.

- **Bias / Radial Tires:** The following applies to all passenger and light truck vehicles, regardless of drive axle(s), except for temporary use of a spare:

  — Never mix bias ply, bias belted, or radial tires on the same axle.

  — Do not mix bias ply, bias belted, or radial tires on 4x4 or AWD vehicles.

  — Never place bias ply or bias belted tires on the rear axle if radial tires are on the front axle, regardless of which axle is the drive axle, unless the vehicle has duals on the rear. (This also applies to winter tires.)



©2005
**BFS Retail & Commercial Operations, LLC**
**Education Department**
All Rights Reserved

BFS/00550
*(Pitts v. BFS)*

# TIRE REPAIR MATERIALS

## The Authorized Tire Repair Materials for Firestone Stores



**6. THE Kit**
Handles approximately 30 tire repairs and contains one each of the following:
THE Patch
THE Filler
THE Cement
THE Cleaner
THE Patch-Plug (Large & Small)

| Description | Store Cost | Min. Order | Reorder Point | Article No. | Quant Order |
|---|---|---|---|---|---|
| 1) THE Patch-Plug (SM) - Box 20 | 7.45/Box | 1 Box | 1 | 7000508 | |
| 2) THE Patch-Plug (LG) - Box 15 | 6.65/Box | 1 Box | 1 | 7000509 | |
| 3) THE Patch  2-1/8" Box 30 | 4.44/Box | 1 Box | 1 | 7001884 | |
| 4) THE Filler - Pkg 30 | 3.95/Pkg. | 1 Pkg. | 1 | 7001882 | |
| 5) THE Cement - 8 oz | 3.09 | 1 Can | 1 | 7001885 | |
| 6) THE Cleaner - 16 oz | 2.38 | 1 Can | 1 | 7001883 | |
| 7) THE Kit | 27.96 | 1 Kit | 1 | 7001886 | |

## "AUTHORIZED" AIR BUFFER KIT & CARBIDE BUFFING WHEEL KIT



### Air Buffer Kit
$34.50
Article No. 7000827

### Carbide Buffing Wheel Kit
$9.20
Article No. 7000720

- Includes six 2-1/2" buffing wheels and one arbor.

Page 4

---

# ELECTRICAL SYSTEM ANALYZER

- Smart
- Simple
- Complete

**MIDTRONICS**
*Battery Management Innovation*

**inTELLECT**

### Brains AND Money

*First the Brains...*
The inTELLECT combines Midtronics' leading edge technology for battery and electrical system diagnostics with a memory saver, key-off draw test, and multimeter functions - all in a shop-rugged, cart-mounted package. The inTELLECT's graphical user interface and test printout allow your customers to see the results and understand what they need, so you can quickly complete the sale!

*Now for the Money...*
Midtronics will give you a $300.00 trade-in toward the purchase of an inTELLECT purchased by March 31, 2007.

MFG. LIST    $3071
BF DEALER DISC    $1368
*TRADE-IN    $300

YOUR NET PRICE
**$1373**
Part # ESA-800-KIT BF
Article No. 7002879

**FOR HELP OR MORE INFORMATION,**
CALL Len Vogt/Lenco @ 847-223-6100

BFS/00551
(Plts v. BFS)

# EXHIBIT C

**CONDENSED TRANSCRIPT AND INDEX
DEPOSITION OF
WILLIAM N. SHERIDAN, JR.
APRIL 20, 2007
CIVIL ACTION NO. 2:06-CV-1008-ID-SRW
L. JOE PITTS, as Administrator
of the Estate of SANDRA ANN
SPENCER PITTS, Deceased,
Plaintiff,
vs.
BRIDGESTONE AMERICAS HOLDINGS,
INC., et al.,
Defendants.**

Birmingham Reporting Service, Inc.
600 20th Street North
Suite 205
Birmingham, Alabama 35203
(205) 326-4444

```
                                                    1
 1         IN THE UNITED STATES DISTRICT COURT
 2           FOR THE MIDDLE DISTRICT OF ALABAMA
 3                   NORTHERN DIVISION
 4
 5    CIVIL ACTION NO. 2:06-CV-1008-ID-SRW
 6
 7    L. JOE PITTS, as Administrator
 8    of the Estate of SANDRA ANN
 9    SPENCER PITTS, Deceased,
10          Plaintiff,
11    vs.
12    BRIDGESTONE AMERICAS HOLDINGS, INC.;
13    BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE,
14    LLC; and BFS RETAIL AND COMMERCIAL
15    OPERATIONS, LLC, doing business as
16    FIRESTONE TIRE & SERVICE CENTERS, jointly
17    and severally,
18          Defendants.
19
20             DEPOSITION
21                of
22         WILLIAM N. SHERIDAN, JR.
23          APRIL 20, 2007
```

```
                                                    2
 1         IT IS STIPULATED AND AGREED, by and
 2    between the parties, that the deposition
 3    of WILLIAM N. SHERIDAN, JR., may be taken
 4    before Julie A. Carroll, Commissioner, at
 5    1819 Fifth Avenue North, Birmingham,
 6    Alabama, 35203, on the 20th day of April,
 7    2007.
 8         IT IS FURTHER STIPULATED AND AGREED
 9    that the signature to and the reading of
10    the deposition by the witness is waived,
11    the deposition to have the same force and
12    effect as if full compliance had been had
13    with all laws and rules of Court relating
14    to the taking of depositions.
15         IT IS FURTHER STIPULATED AND AGREED
16    that it shall not be necessary for any
17    objections to be made by counsel to any
18    questions except as to form or leading
19    questions, and that counsel for the
20    parties may make objections and assign
21    grounds at the time of trial, or at the
22    time said deposition is offered in
23    evidence, or prior thereto.
```

```
                                                    3
 1             A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4       Hon. Robert P. Bruner
 5       Lanny Vines & Associates
 6       2142 Highland Avenue South
 7       Birmingham, Alabama, 35205
 8
 9    FOR THE DEFENDANTS:
10       Hon. Hope T. Cannon
11       Bradley, Arant, Rose & White
12       One Federal Place
13       1819 Fifth Avenue North
14       Birmingham, Alabama, 35203
15
16    OTHERS PRESENT:
17       Brett Brown
18
19
20
21
22
23
```

```
                                                    4
 1                I N D E X
 2    EXAMINATION BY:              PAGE NO.
 3    Mr. Bruner            6
 4             E X H I B I T S
 5    NUMBER                   PAGE NO.
 6    Plaintiff's Exhibit 1        6
 7    (Re-Notice of Deposition)
 8    Plaintiff's Exhibit 2       32
 9    (12/11/04 invoice)
10    Plaintiff's Exhibit 3       32
11    (2/26/05 invoice)
12    Plaintiff's Exhibit 4       32
13    (12/10/05 invoice)
14    Plaintiff's Exhibit 5       32
15    (12/15/05 invoice)
16    Plaintiff's Exhibit 6       78
17    (Tire Resource Manual)
18    Plaintiff's Exhibit 7       86
19    (Answers to Interrogatories)
20    Plaintiff's Exhibit 8       87
21    (Tire Demounting, Mounting and Repair)
22    Plaintiff's Exhibit 9       90
23    (Quick Start)
```

**5**

E X H I B I T S

(Cont.)

| NUMBER | PAGE NO. |
|---|---|
| Plaintiff's Exhibit 10 | 91 |
| (You Auto Know) | |
| Plaintiff's Exhibit 11 | 96 |
| (Training History) | |
| Plaintiff's Exhibit 12 | 109 |
| (Organizational Chart) | |
| Plaintiff's Exhibit 13 | 118 |
| (RMA Wall Chart) | |

**7**

1  record.
2      A  William N. Sheridan, Jr.
3      Q  Mr. Sheridan, what's your home
4  address?
5      A  It's 153 Brookridge Court,
6  Douglasville, Georgia.
7      Q  Okay.  And how are you currently
8  employed?
9      A  I'm employed by Bridgestone
10  Firestone as the Education Manager for the
11  Southeast Zone.
12      Q  Okay.  And when you say *Bridgestone
13  Firestone*, I've been dealing with several
14  different entities in this case.
15      A  Bridgestone Firestone Retail and
16  Commercial.
17      Q  Okay.  And tell me that again, the
18  title.  I'm sorry.
19      A  Education Manager for the Southeast
20  Zone.
21      MS. CANNON:  And the name of the
22  entity is BFS Retail and Commercial
23  Operations.

**6**

1      I, JULIE CARROLL, a Court Reporter
2  of Birmingham, Alabama, and a Notary
3  Public for the State of Alabama at large,
4  acting as Commissioner, certify that on
5  this date, as provided by the Federal
6  Rules of Civil Procedure and the foregoing
7  stipulation of counsel, there came before
8  me at 1819 Fifth Avenue North, Birmingham,
9  Alabama, 35203, beginning at 9:02 a.m.,
10  WILLIAM N. SHERIDAN, JR., witness in the
11  above cause, for oral examination,
12  whereupon the following proceedings were
13  had:
14
15      WILLIAM N. SHERIDAN, JR.,
16  being first duly sworn, was examined and
17  testified as follows:
18
19  (Whereupon, Plaintiff's Exhibit 1
20  was marked for identification.)
21
22  EXAMINATION BY MR. BRUNER:
23      Q  Please state your name for the

**8**

1      THE WITNESS:  Yeah, BFRC,
2  but that's --
3      MR. BRUNER:  Yeah.  And if we can
4  just reach an agreement, I'll call it BFRC
5  from now on.
6      MS. CANNON:  Okay.  That's fine.
7      Q  (BY MR. BRUNER:)  What does the
8  Southeast Zone encompass?
9      A  It encompasses basically the seven
10  southeastern states.  We have 13 districts
11  across that area.
12      Q  Okay.  And are you based out of
13  Douglasville, or do you work out of --
14      A  The zone office is actually in
15  Marietta, Georgia.
16      Q  Okay.  How long have you been in
17  that job?
18      A  In that particular position as
19  Education Manager since last June.
20      Q  Okay.  And what -- Do you have a
21  written job description somewhere?
22      A  I'm sure there is.  I haven't seen
23  a written job description.

**9**

1  Q Okay.
2  A But I know there is one.
3  Q Describe to me your duties in that
4  role.
5  A As the Education Manager, I'm
6  responsible for making sure that all the
7  education or responsible for the education
8  across the zone.
9  Q Okay. And BFRC, just for my
10  clarification, those are the Firestone
11  commercial, or maybe a better way,
12  Firestone retail stores; is that right?
13  A That is the retail stores.
14  Correct.
15  Q Okay. How many of those are in
16  your zone?
17  A At this time there's 350.
18  Q Okay. I think I've seen somewhere
19  in defendants' discovery that there are
20  2,200 across the United States
21  thereabouts. Is that --
22  A Thereabouts.
23  Q -- a reasonable estimate?

**10**

1  A Uh-huh.
2  Q And I think I may have asked you,
3  but I don't remember what you said. How
4  long have you been in this specific job?
5  A In this position since last June.
6  June of 2006.
7  Q Okay. Prior to that what were you
8  doing?
9  A I was the Education Coordinator for
10  the Southeast Zone.
11  Q And how did that differ from what
12  you're doing now? Is that just one step
13  below?
14  A One step below. That dealt
15  specifically with the technical education.
16  Q What do you mean by technical
17  education?
18  A That would be the training of the
19  technicians.
20  Q Okay. And you use the term
21  *technicians*. Who is that specifically in
22  the context you're using the term?
23  A That would be the technicians in

**11**

1  the stores themselves, the people that
2  actually work on the vehicle in the store.
3  Q Okay.
4  A And supplying technical information
5  to the selling associates, as far as
6  vehicle repair.
7  Q How long were you Education
8  Coordinator?
9  A This time from 2003 until 2006.
10  Q Okay. You may or may not be aware,
11  but the conduct that's the basis of this
12  lawsuit happened in 2005. So during that
13  time you would have been Education
14  Coordinator for the Southeast Zone; is
15  that right?
16  A Correct.
17  Q Were you the only one?
18  A For the Southeast Zone Office,
19  correct.
20  Q Okay. And then you would have had
21  a boss who was in the role you hold now,
22  which would be Education Manager; is that
23  right?

**12**

1  A Correct.
2  Q Who would that have been at the
3  time?
4  A At that time that would have been
5  Vic Martin. And to kind of clarify, as
6  far as boss, he was somewhat of a direct
7  report, but both of us direct reported to
8  the Operations Manager at the zone.
9  Q And who was that during that time
10  period?
11  A That would have been Chip Franklin.
12  Q And what generally is the role, his
13  role, as Operations Manager?
14  A Store operations.
15  Q Okay.
16  A Anything to do with the store.
17  Q Okay. Prior to 2003 -- And I think
18  you told me you may have held that
19  position of Education Coordinator multiple
20  times.
21  A Correct.
22  Q But immediately prior to when you
23  took it, starting in 2003, what were you

**13**

1 doing?

2     A Prior to 2003 I was a Store Manager

3 in two different stores.

4     Q Okay. What stores were those?

5     A One was in Greenwood, South

6 Carolina, and then I was moved to a store

7 in Woodstock, Georgia.

8     Q And what are those dates?

9     A Let's see. You're going to test my

10 brain on this.

11     Q Well, best you can do. None of us

12 can remember exactly --

13     A Roughly March of 2000 I went to

14 Greenwood, South Carolina, came back to

15 Atlanta in September, or to the Woodstock

16 location, a suburb of Atlanta, probably

17 September of '02, until March of '03, when

18 I came back to the zone office.

19     Q Okay. So we're looking about 2000

20 to 2003 where you're Store Manager at

21 those two different locations?

22     A Correct.

23     Q Okay. And then you say you came

**14**

1 back to the zone office. So I'm guessing

2 prior to 2000 you were --

3     A Prior to that.

4     Q Was that as Education Coordinator?

5     A Education Coordinator from 1995

6 until 2000.

7     Q Okay. What led you to make those

8 -- go from Education Coordinator to going

9 into the stores?

10     A I wanted to learn more about the

11 Store Manager's role, the operation of the

12 Store Manager.

13     Q Okay.

14     A Learn more of that side of the

15 business.

16     Q How long, prior to 2000, were you

17 in your role for the first time as

18 Education Coordinator?

19     A From 1995 until 2000.

20     Q Okay. And this is all in the

21 Southeastern Zone?

22     A All in the Southeastern Zone.

23     Q Okay. And what were you doing

**15**

1 prior to 1995?

2     A I was a technician in a Firestone

3 store.

4     Q Okay. And where was that?

5     A That was in two different stores in

6 Atlanta, the Atlanta area.

7     Q Okay. So you would have actually

8 worked in the stores and repaired tires

9 during that time?

10     A Uh-huh. Correct.

11     Q How long prior to 1995 did you do

12 that?

13     A I started with Firestone in 1993.

14     Q Okay. Started out as a technician?

15     A As a technician.

16     Q What were you doing prior to 1993?

17     A I was a technician for a couple of

18 other companies throughout the years prior

19 to that.

20     Q Okay. How long have you been doing

21 that?

22     A Full-time as a technician actually

23 since I got out of high school in 1969.

**16**

1     Q Okay.

2     A Other than some time in the

3 military.

4     Q Okay. And what were those other

5 places you worked at?

6     A I worked for an independent shop,

7 again in the Atlanta area, same gentleman,

8 for almost 20 years. I left them, went to

9 work for another shop for almost a year

10 and then another shop for probably close

11 to two years.

12     Q Okay.

13     A And then came to work for

14 Firestone.

15     Q Since you graduated high school in

16 '69, have you had any other formal

17 education since that time?

18     A I actually went to DeKalb Area

19 Technical School for about six months,

20 taking an automotive course.

21     Q Okay. And while you were -- I may

22 not be phrasing this the best way, so tell

23 me, you know, correct me if I'm wrong.

**17**

1  Were you doing basically all types of work
2  that a technician would do at these stores
3  during your career?
4     A Pretty much. Everything other
5  than, you know, what I will term as major
6  engine or major transmission work. All
7  types of routine maintenance type of work.
8     Q Okay. Were you involved in tire
9  repairs from the time you started in 1969
10 until the time you went to --
11    A Yes, I was.
12    Q Prior to the time you took the job
13 as Coordinator.
14    Have you ever been deposed before?
15    A Yes.
16    Q When was the last time?
17    A Two years ago, maybe.
18    Q Okay. Do you recall what the
19 nature of that deposition was?
20    A It was a ball joint failure.
21    Q Okay. How many -- Do you have an
22 idea of how many times you've been
23 deposed?

**18**

1     A This would be the second.
2     Q That was the only other time?
3     A That was the only other time.
4     Q Okay. And was that deposition
5  concerning work done at a Firestone --
6     A Yes.
7     Q -- or BFRC commercial store?
8     A Yes.
9     Q I guess BFRC retail store is what I
10 meant to say.
11    And what was generally the nature of
12 your testimony in that deposition?
13    A It was on the technical aspect of
14 ball joints and proper procedure for
15 inspecting ball joints.
16    Q I gather somebody had made a claim
17 that BFRC had failed to properly inspect a
18 ball joint?
19    MS. CANNON: Object to the form.
20 Go ahead.
21    A Correct.
22    Q Okay. Do you recall the name of
23 that case?

**19**

1     A Eula Hale.
2     Q Do you recall where that case was
3  pending, where it was filed?
4     A It was in Alabama, but I don't
5  remember what county or city.
6     Q Okay. Do you recall any of the
7  attorneys, either the defense attorney or
8  the plaintiff's attorney?
9     A It was Bradley Arant for the
10 defense.
11    Q Okay. Do you recall the
12 plaintiff's attorney?
13    A Quite honestly, no.
14    Q Fair enough.
15    What materials have you reviewed in
16 preparation for this deposition today?
17    A Our tire repair procedure
18 materials.
19    Q Okay. And can you be more specific
20 about that? And we can go through some
21 documents later, but --
22    A The Quick Start is the name of one
23 of them. The Certified for Excellence

**20**

1  Dismount, Mount and Repair, and the You
2  Auto Know Volume 1 videotape.
3     Q Is that all that you've reviewed?
4     A Yes.
5     Q Have you reviewed anything I'd call
6  case specific, anything that -- any
7  records of service on my client's vehicle
8  or anything with respect to the work done
9  at the store in Montgomery?
10    A I've seen copies of the invoices.
11    Q Okay. Anything else?
12    A No.
13    Q Other than your attorneys, have you
14 discussed this case with anyone in
15 preparation for today?
16    A No.
17    Q You haven't talked with anybody
18 that works down at that store in
19 Montgomery?
20    A No.
21    Q Okay. Have you visited the store
22 in Montgomery? In preparation --
23    A Recently?

**21**

1    Q Yeah. I'm talking about
2 specifically in preparation --
3    A No.
4    Q Okay. I gather from your answer
5 that you have at some point; is that
6 right?
7    A At some point, but I have no clue
8 when it would be.
9    Q Okay. Have you examined either the
10 tires that were on the subject vehicle or
11 any photographs of the tires in this case?
12    A No, I have not.
13    Q I'm going to hand you what's been
14 marked as Plaintiff's Exhibit 1, and this
15 is the plaintiff's -- I guess it's a
16 re-notice of deposition of BFRC.
17    I want to ask you first, have you had
18 an opportunity to look at this prior to
19 right now?
20    A Yes, I have looked at this.
21    Q Okay. And when did you first see
22 this document?
23    A A week ago, two weeks ago, I guess.

**22**

1    Q Okay. And I want to direct your
2 attention to Page 4. And under the
3 heading *Subjects on Which Testimony is*
4 *Requested*, the first thing we requested
5 there was testimony concerning any and all
6 repair or service work done by BFRC and/or
7 the subject store on the vehicle involved
8 in the matter made the basis of the
9 plaintiff's claims. And what I want to
10 ask you is, Are you knowledgeable about
11 information requested there and prepared
12 to testify about that today?
13    A Yes.
14    MS. CANNON: Let me just also say
15 for the record that we just produced to Bo
16 a copy of our objections to this
17 deposition notice, and Mr. Sheridan is
18 going to be the witness who's been
19 designated as our 30(b)(6) rep for the
20 categories outlined in the depo notice
21 other than the ones that we objected to.
22    MR. BRUNER: Okay. Well, I haven't
23 had much of a chance to review the

**23**

1 objections.
2    MS. CANNON: Right.
3    Q (BY MR. BRUNER:) So I'm still
4 going to walk through this and make sure
5 we know where we are.
6    I wanted to look at Number 2, and it's
7 testimony concerning policies and
8 procedures regarding tire puncture repair
9 in passenger and light truck tires at
10 BFRC's retail stores, including the
11 subject store, during the years 2003
12 through 2006.
13    Are you knowledgeable of those matters
14 and prepared to testify to that today?
15    A Yes.
16    MR. BRUNER: Okay. And Hope, since
17 I haven't had a chance to look at those,
18 if you want to chime in, just so we're all
19 clear.
20    MS. CANNON: Yeah, I will.
21    Q (BY MR. BRUNER:) Number 3,
22 testimony concerning any and all efforts
23 undertaken by BFRC to make sure its

**24**

1 policies and procedures regarding the
2 repair of punctures of passenger and light
3 truck tires were followed at BFRC's retail
4 locations, including the subject store,
5 during the years 2003 through 2006.
6    Are you knowledgeable of those matters
7 and prepared to testify concerning that
8 today?
9    A Yes.
10    Q The next one is testimony
11 concerning any and all lawsuits filed
12 against BRFC, *BFRC*, it should say, making
13 claims for damages of any type allegedly
14 caused by negligent/wanton tire repair
15 done by BFRC during the years 2000 through
16 2005.
17    MS. CANNON: That's one of the ones
18 that we had an objection to, very similar
19 to the objections that we made in our
20 interrogatory request that you've already
21 gotten, and I think the objection
22 basically is that it would be
23 overly-burdensome.

**25**

1       MR. BRUNER: Sure.
2       MS. CANNON: There's no way, based
3 on the way that the lawsuits are
4 organized, for BFRC, without going through
5 each lawsuit that's been filed, to find
6 out whether it was for a negligent/wanton
7 tire repair.
8    Q (BY MR. BRUNER:) And we're going
9 to seek to resolve that at some point,
10 but it's fair to say you're not prepared
11 to testify to those matters today?
12    A Correct.
13      MR. BRUNER: Okay. Number 5 is
14 another, and you can read it there,
15 another one concerning lawsuits, and I
16 assume the answer is the same.
17      MS. CANNON: Actually, on Number 5,
18 what we -- Let me read it. On Number 5,
19 consistent with the interrogatory
20 responses, there have been no lawsuits
21 filed against BFRC for negligent or wanton
22 tire repair.
23      MR. BRUNER: Okay.

**26**

1      MS. CANNON: And therefore there
2 was no reason to put up a witness to talk
3 about lawsuits.
4      MR. BRUNER: Okay.
5      MS. CANNON: For Number 5.
6      MR. BRUNER: Number 6 is testimony
7 concerning complaints of any nature or
8 type regarding any alleged improper tire
9 repair done by BFRC during the years 2000
10 through 2005.
11      MS. CANNON: We made the objection
12 in the depo notice, very consistent with
13 the objection made in the interrogatories,
14 that that is just -- There's no way for
15 BFRC to -- It's overly-burdensome to
16 figure that out, because that's not how
17 complaints are organized.
18    Q (BY MR. BRUNER:) Is it fair to say
19 you're not knowledgeable of those matters
20 and prepared to testify to that?
21    A Correct.
22      MS. CANNON: I will say, though,
23 that you can ask Mr. Sheridan whether he

**27**

1 has any knowledge of any of those
2 complaints.
3      MR. BRUNER: Sure. He's just not
4 designated for that.
5      MS. CANNON: Right.
6      MR. BRUNER: And Number 7, I would
7 assume, is the same.
8      MS. CANNON: Number 7, I think, in
9 our objections, and it should be
10 consistent with our interrogatory
11 responses, BFRC is not aware of any
12 complaints alleged against the subject
13 store during those years for negligent
14 tire repair, or, as you put it here,
15 improper tire repair.
16      MR. BRUNER: Okay.
17      MS. CANNON: But that obviously
18 would be limited to anything that's -- You
19 know, they're not aware of anything that's
20 been submitted in writing.
21      MR. BRUNER: Sure. Any complaints
22 to them.
23      MS. CANNON: Right.

**28**

1    Q (BY MR. BRUNER:) Number 8,
2 testimony concerning any and all training
3 BFRC provided to or required of its
4 employees concerning the repair of tire
5 punctures during the years 2003 through
6 2006.
7    Are you knowledgeable of those matters
8 and prepared to testify to that today?
9    A Yes.
10    Q Okay. Number 9, testimony
11 concerning any and all training BFRC
12 and/or the subject store provided to or
13 required of those individuals who
14 performed the work on the decedent's
15 vehicle at any point in time. And that's
16 specifically directed to folks who worked
17 on my client's car.
18    Are you knowledgeable of those matters
19 and prepared to testify to that today?
20    A Yes.
21    Q Number 10, testimony concerning any
22 and all documents provided by BFRC to the
23 subject store, other stores, and any

**29**

1  employees, regarding tire puncture repair,
2  during the years 2003 through 2006.
3      Same question. Are you knowledgeable
4  of those matters and prepared to testify
5  to that today?
6      A Yes.
7      Q Number 11, testimony concerning
8  record-keeping practices and procedures at
9  BFRC and the subject store.
10     Are you knowledgeable of those matters
11 and prepared to testify to that today?
12     A Yes.
13     Q Okay. Testimony concerning the
14 relationship between BFRC, Bridgestone
15 Americas Holdings, and Bridgestone
16 Firestone North American Tire, LLC.
17     Are you knowledgeable of those
18 matters?
19     A Yes.
20     Q Prepared to testify to that today?
21     A (Witness nods head affirmatively.)
22     Q Number 13, testimony concerning any
23 materials provided to BFRC and/or the

**30**

1  subject store by Bridgestone Americas
2  Holdings, Inc., Bridgestone Firestone
3  North American Tire, LLC, or any other
4  Bridgestone/Firestone entity, during the
5  years 2003 to 2006, which in any way
6  address tire puncture repair.
7      Are you knowledgeable of those matters
8  and prepared to testify to them today?
9      A Yes.
10     Q Okay. Mr. Sheridan, do you have
11 any personal knowledge of the work that
12 was performed on Sandra Pitts's car at the
13 subject store? And when I say *subject*
14 *store*, I mean to say the Montgomery store,
15 but --
16     MS. CANNON: Madison Avenue store.
17     MR. BRUNER: Yeah.
18     MS. CANNON: There are several
19 stores in Montgomery.
20     MR. BRUNER: Are there several?
21 Okay. The Madison Avenue store in
22 Montgomery.
23     THE WITNESS: When you're saying

**31**

1  personal knowledge, are you -- I guess I
2  need clarification there.
3      Q (BY MR. BRUNER:) Sure. I think
4  that's fair. Other than the repair
5  invoices you've looked at, do you have any
6  other knowledge of repair work done on her
7  car?
8      A No. I've only seen the repair
9  invoices.
10     Q Okay. And I believe we established
11 you haven't talked to anybody at that
12 store about this case; is that right?
13     A That is correct. I have not.
14     Q Do you have any knowledge of who
15 would have dealt with Sandra Pitts on the
16 occasions reflected in those invoices that
17 you have seen?
18     MS. CANNON: You're asking him who
19 worked on the vehicle?
20     MR. BRUNER: Yeah.
21     MS. CANNON: I think, if he looked
22 at the invoices, he would be able to tell
23 you who worked on the vehicle, because

**32**

1  they're all identified in there.
2      THE WITNESS: Right.
3      Q (BY MR. BRUNER:) Anything other
4  than -- Your knowledge again, with respect
5  to who worked on it, would be limited to
6  those?
7      A Would be limited to looking at
8  invoices. Correct.
9      Q Okay. And of course, you never
10 spoke to Sandra Pitts?
11     A No.
12     MR. BRUNER: Okay. Let's look at
13 those invoices.
14
15     (Whereupon, Plaintiff's Exhibits 2-5
16     were marked for identification.)
17
18     Q (BY MR. BRUNER:) I'm going to hand
19 you what's been marked as Plaintiff's
20 Number 2, and this is the -- We were
21 provided four invoices, and I have
22 organized them in date order, and I'm
23 going to walk through them with you in

**33**

1  date order and just ask you some questions
2  about them.
3      Tell me basically how this invoice,
4  how this document we're looking at as
5  Plaintiff's Exhibit 2 is generated.
6      A This is generated through our point
7  of sale terminal. A selling associate in
8  the store, customer service advisor, if
9  you will, you know, would actually type
10  into the POS terminal, you know, the
11  customer's name and vehicle information
12  and then their request for service.
13      Q Okay. Is there a way to tell on
14  this who types that in?
15      A In this particular case, in the top
16  right corner, it shows that the service
17  advisor was Teammate Number 04 JD.
18      Q Okay. Do you know who that is?
19      A Quite honestly, no.
20      Q Sure. I understand.
21      A I personally don't.
22      MS. CANNON: We can provide that
23  name to you before --

**34**

1      MR. BRUNER: Yeah, we can --
2      MS. CANNON: You know, during a
3  break.
4      Q (BY MR. BRUNER:) We can work all
5  that out.
6      In this -- Of course, it's got the
7  vehicle identified at the top; is that
8  right?
9      A Uh-huh. Correct.
10      Q And the date, with the time in and
11  out; is that right?
12      A Correct.
13      Q And what does that time in and out
14  -- Is that when the customer comes and
15  then when the customer picks it up?
16      A That is correct, or that's the time
17  -- Excuse me. That *out*, yes, would be the
18  time that they left. I'm sorry.
19      Q Okay.
20      A I was thinking that was the time
21  due, but that's --
22      Q When they actually drive off with
23  the vehicle?

**35**

1      A When they pay for their invoice.
2  Correct.
3      Q Okay. And under a heading that
4  says *Retail Sale*, that appears to be
5  listing the work that was done; is that
6  correct?
7      A Correct.
8      Q And here it looks like she had an
9  oil change?
10      A Correct.
11      Q And it shows *courtesy check* down
12  there below *oil change*. What is a
13  courtesy check?
14      A A courtesy check is a no-charge
15  service that we provide to our customers,
16  upon request, obviously, or unless they
17  deny the service, where we're going to
18  check their fluid levels, their belts and
19  hoses, tires, tire pressure, and such.
20      Q Okay. And there beneath *courtesy*
21  *check*, it lists *technicians*, and I assume
22  those are the people that worked on the
23  car; is that right?

**36**

1      A That would be the technician that
2  was assigned to work on the vehicle.
3  Correct.
4      Q Okay. And how does that work? How
5  does that get assigned to a certain
6  technician? How does that work?
7      A It basically would depend on the
8  type of work that was to be done on it,
9  the qualifications of the technician, you
10  know, obviously, and then, if there were
11  multiple technicians with that
12  qualification, whichever would be the
13  first available.
14      Q Okay. And there is listed the
15  number *20* and *P. Clemons* under
16  *Technicians*; is that right?
17      A Correct.
18      MS. CANNON: *P. Clemons*, but it is
19  Pete.
20      Q (BY MR. BRUNER:) It is Pete?
21      A Yes.
22      Q Okay. Do you know Pete Clemons?
23      A Personally, no.

37

1    Q Okay. What, if anything, do you
2    know about Pete Clemons?
3        A I know his education history from
4    looking back at what training courses he
5    has attended. At some point in time I
6    could have very easily have met him. But
7    here again, with the number of stores I
8    deal with, I couldn't say for sure that --
9        Q Where was it that you looked up his
10   training history?
11       A Through our computer system.
12       Q Okay. And would that be something
13   that somebody at your organization could
14   retrieve for me, provide to your defense
15   lawyers?
16       A Could they retrieve it?
17       Q Yeah. I mean, is it possible to
18   retrieve it?
19       A Sure.
20       Q Okay. What's that look like? Is
21   it just a list of all the training he has
22   personally had?
23       A Correct.

38

1    Q Okay. And do you have that for
2    every technician in your zone?
3        A I can retrieve that for every one.
4    Correct.
5        Q And I'm going to write you a
6    letter. I'm not going to stop and say to
7    request things on the record, but I'll
8    write you a letter after this for things.
9        What do you recall about -- When you
10   looked at the training Mr. Clemons has
11   had, do you remember what it was?
12       A Every individual item? No, quite
13   honestly not. There was quite a few on
14   there.
15       Q Do you recall how long he had been
16   with the company? Can you tell that by
17   looking at that?
18       A You could tell when he completed
19   his first education piece, but I do not
20   remember what the date was.
21       MS. CANNON: Bo, just so that Bill
22   doesn't -- You know, we don't want to put
23   him up twice, obviously. If there are

39

1    questions -- He can give you general ideas
2    of what Pete took. But if you actually
3    want to see the list, we can take a break
4    and get the --
5        MR. BRUNER: Have you got it here?
6        MS. CANNON: Or I can get it, and
7    then you can ask him about it, to keep him
8    from having to come back up, if you
9    actually want to see the list.
10       MR. BRUNER: Yeah, let's do that,
11   and then we don't have to do it --
12       MS. CANNON: Okay. Do you want to
13   do it now, or do you want to just kind of
14   break at a normal breaking point?
15       MR BRUNER: Is it something you've
16   got here in the office, or is it something
17   that's going to take you a minute?
18       MS. CANNON: I don't know. I'll
19   have to check.
20       MR. BRUNER: Why don't we go ahead
21   and take a little break, just so you can
22   get that moving, if it's going to take
23   some time.

40

1        MS. CANNON: Okay. Do you want to
2    take a break right now?
3        MR. BRUNER: Yeah. I mean, I don't
4    have to ask him about it right now, but I
5    don't want to request it an hour from now
6    and then not have time.
7        MS. CANNON: Okay.
8
9        (Whereupon, a brief recess was taken.)
10
11       Q (BY MR. BRUNER:) I think the next
12   page on Plaintiff's Exhibit 2 says
13   *Recommended Services not Authorized by*
14   *Customer.* I gather that's exactly what it
15   says. Do you have the same one I do?
16       A (Indicating).
17       Q Yeah, you do. Is this service that
18   was recommended that she chose not to do?
19       A Correct.
20       Q Okay. And at the back of that
21   page, it looks like a warranty page, and
22   then the next page has *Work Order* in the
23   top left. What is that?

**41**

1　A　That would be the actual copy of
2　the ticket that the technician receives.
3　　Q　Okay.
4　A　To do the work.
5　　Q　Okay. And how is this generated?
6　A　This is generated initially by the
7　point of sale terminal, the POS terminal,
8　that the information is typed in.
9　　Q　And then it's given to whatever
10　technician the job is assigned to?
11　A　Correct.
12　　Q　Okay. Do you have any idea what
13　the *#20* written in the middle of the page
14　refers to?
15　A　That would be the technician that
16　performed the services, their teammate ID
17　number.
18　　Q　Okay.
19　A　As you saw on the front page,
20　P. Clemons.
21　　Q　Okay. And on the back of that is a
22　vehicle inspection?
23　A　Correct.

**42**

1　　Q　What is that?
2　A　It's the form that the technician
3　uses when they perform either a vehicle
4　inspection or the courtesy check.
5　　Q　Okay.
6　A　Whichever the customer requested.
7　　Q　Okay.
8　A　Or authorized.
9　　Q　Okay. Is there any difference
10　between the vehicle inspection and the
11　courtesy check? I mean, is that the same?
12　A　Correct. On the courtesy check,
13　that is the free inspection that we offer
14　our customers, and on those the technician
15　will check the items that are highlighted
16　or shaded in these two areas.
17　　Q　Okay.
18　A　Then on a complete vehicle
19　inspection, they would check all of the
20　items as the vehicle is equipped.
21　　Q　Okay. So this --
22　A　And that's a paying service. The
23　customer pays for the vehicle inspection.

**43**

1　　Q　Okay. So was this a -- It looks
2　like not everything is checked. So was
3　this a courtesy check?
4　A　Correct. As you can see on the
5　front of the invoice, it was listed as a
6　courtesy check.
7　　Q　Okay. And down here in the notes,
8　on the bottom left, you've got some
9　handwriting there. Can you interpret that
10　for me?
11　A　That would be items that the
12　technician had recommended and marked in
13　the upper section of the paper --
14　　Q　Okay.
15　A　-- as being a service that was
16　suggested.
17　　Q　And those things look like they're
18　under a column with an *R* at the top; is
19　that right?
20　A　Correct.
21　　Q　And then there's an *S* next to that.
22　What is the *S* for?
23　A　The *S* would be a suggested service.

**44**

1　*R* would be a required service, according
2　to the MAP standards.
3　　Q　Okay. And marked under *recommended*
4　there is three tires; is that right?
5　A　Correct.
6　　Q　And I guess that's the tire size
7　next to it?
8　A　It appears to be, yes.
9　　Q　Okay. And there's a whole other
10　box for tires in the upper right.
11　A　Correct.
12　　Q　And that -- I guess it lists each
13　tire individually and then gives a series
14　of columns for each tire; is that right?
15　A　Correct.
16　　Q　And first there it says -- I guess
17　the one at the top is *left rear*, and then
18　it says next to that *32nds*. What is that
19　box?
20　A　It is the box for the tread depth
21　remaining on the tire.
22　　Q　Okay.
23　A　Measured in 32nds.

45

1   Q And there it's six 32nds; is that
2   right?
3   A Correct.
4   Q And then it has boxes for PSI in
5   and PSI out; is that correct?
6   A Correct.
7   Q And then it has three boxes, *ACC,*
8   *SUG,* and *REQ.* Is that acceptable,
9   suggested, and required?
10   A Correct.
11   Q Okay. And here it appears that the
12   technician marked as required three tires;
13   is that right?
14   A Correct.
15   Q And he's got some handwriting next
16   to those three Rs. I can't really tell
17   what that says. Is it *worn out,*
18   *dry-rotted,* and *cupped out*? Is that
19   right?
20   A That's what it appears to be.
21   Correct.
22   Q Okay. And what does that mean?
23   A The tires, from what I'm looking

46

1   at, you know, in trying to determine his,
2   you know, his writing here, you know,
3   cupped out would be irregular wear
4   patterns on the tire, having some waviness
5   in the tire, where the tire is wearing
6   improperly. The dry-rotted, you know, he
7   must have seen some cracking in the tires
8   due to age.
9   Q Above that box it has a tire size,
10   a place to put the tire size and a place
11   to put the tire speed rating?
12   A Correct.
13   Q Is there anywhere that the identity
14   of the specific tires are recorded? Do
15   they put the DOT numbers on this anywhere?
16   A No, there is none.
17   Q Okay. I'll hand you what's been
18   marked as Plaintiff's 3, and this is a
19   record dated 2/26/05. On this one the
20   service advisor is W, 01 W, in the upper
21   right-hand corner. Do you know who that
22   is?
23   A I do not, not by just the initial

47

1   *W.*
2   Q Okay. And then again we have,
3   under *Retail Sale* -- I believe you
4   testified on the earlier exhibit that was
5   a description of the work performed; is
6   that right?
7   A Correct.
8   Q Again it's an oil change, and
9   there's another courtesy check, belts, and
10   tire repair; is that right?
11   A Correct.
12   Q And I want to skip ahead a second.
13   On this one there are two technicians
14   listed; is that right?
15   A Correct.
16   Q Number 12, K. Young, and Number 20,
17   P. Clemons?
18   A Correct.
19   Q Do you know who K. Young is?
20   A I do not. Not personally.
21   Q Okay. Did you have occasion to
22   look at his training as you did Mr.
23   Clemons?

48

1   A I did not look at his.
2   Q Okay. Is there any way to tell on
3   this Exhibit 3 who did what work on Mrs.
4   Pitts's car?
5   A Yes, sir, there is.
6   Q How is that?
7   A At the top, where it says *Article*
8   *Number,* and then next is *ID.*
9   Q Right.
10   A You can look down at the
11   technician's ID number, and you can see
12   the Number 20 performed certain services,
13   and the Number 12 performed certain
14   services. Number 12 would be K. Young.
15   Q Okay.
16   A Number 20 would be P. Clemons.
17   Q Okay. And next to the headings
18   that show what work was done, there's also
19   Number 01. Does that refer to the service
20   advisor?
21   A That was just the service advisor.
22   Q Okay. And that's just showing he
23   assigned the job?

49

1 A That he was the one that took that
2 particular job in or printed the -- you
3 know, took that information from the
4 customer.
5 Q Okay. And you may have just told
6 me, but what's the difference between TS
7 and NS? Do you see what I'm referring to?
8 A Honestly, I'm personally not sure.
9 Q Okay. So this record indicates
10 that Number 20, which is P. Clemons, did
11 the tire repair and the courtesy check; is
12 that right?
13 A Correct.
14 Q And next to *tire repair* it says
15 *wheel removal*. We'll talk about this
16 later, but right now I just want to ask
17 you, What is that there for, or what does
18 that indicate?
19 A Taking the tire off the vehicle
20 itself to repair it.
21 Q Okay. And then below that it says
22 *flat repair, patch-plug*. What is that?
23 A That would be the part that was

50

1 used or the type of repair. It was either
2 a patch or a patch-plug.
3 Q Okay. And was that --
4 MS. CANNON: Bill, I think you may
5 have said that wrong. You said it was
6 either a patch or a patch-plug.
7 THE WITNESS: Well, a patch-plug or
8 a filler and patch. Excuse me.
9 Q (BY MR. BRUNER:) Can we say that
10 again? I'm sorry.
11 A It would either have been done with
12 a patch-plug or a filler and patch.
13 Q Okay. Let me clarify right now
14 before we move ahead. What is a -- Let's
15 take those two in turn. What is a
16 patch-plug?
17 A A patch-plug is actually a
18 one-piece unit that has the patch itself
19 as well as the filler made onto it.
20 Q Okay.
21 A And the other would be a two-piece
22 unit.
23 Q Okay. And that's where the patch

51

1 and the filler unit are two different
2 pieces?
3 A Correct.
4 Q Okay. And then beneath that, it
5 says *flat repair labor*; is that right?
6 A Correct.
7 Q And that's $11; is that correct?
8 A Correct.
9 Q And does that reflect the labor of
10 doing everything involved in repairing the
11 tire?
12 A Correct.
13 Q Okay. With a patch-plug or a patch
14 and filler?
15 A Correct.
16 Q Then the next page, again we have
17 the work order, and the work order doesn't
18 have the tire repair on there. Am I
19 missing it, or is this a correct
20 statement?
21 A That's correct.
22 Q Do you know why that is?
23 A It appears that, when the customer

52

1 originally came in, they came in
2 requesting the oil change and the courtesy
3 check. It could be, and I would have to
4 look at the form further to find out, but
5 it appears that we possibly recommended by
6 way of seeing, you know, the need for the
7 flat repair once the tire was -- once the
8 vehicle was brought into the shop.
9 Q Okay. Go ahead and look at that
10 further and tell me if you can see that
11 anywhere.
12 A On the back side of the inspection
13 form, you can see, in the notation, *left
14 rear flat repair*.
15 Q Okay.
16 A So the technician apparently found
17 something --
18 Q After?
19 A Correct. While performing the
20 courtesy check.
21 Q After the work order had been
22 generated?
23 A Right.

53

1    Q Okay. And that's not unusual, is
2    it, for a customer to have a tire puncture
3    and not know it until it's seen by the
4    technician?
5        MS. CANNON: Object to the form.
6    A In some cases.
7    Q What is 950K6 that's in handwriting
8    there on the work order?
9    A That appears to be the part number
10   for the serpentine belt that was
11   installed.
12   Q Okay.
13   A When you look on the front side,
14   you can see that that's the part number
15   that was billed out.
16   Q Okay. And then looking on the back
17   page of Plaintiff's 3, it appears that
18   this is again the record for the courtesy
19   check, isn't it?
20   A Correct.
21   Q And looking back to the tire
22   services, or tires and tire services,
23   again we have another examination of the

54

1    tires as part of that courtesy check; is
2    that right?
3    A Correct.
4    Q And at that point the box there
5    with the 32nds, is that showing two
6    measurements taken on the tire tread?
7    A That's what it appears to be, yes.
8    Q Okay. And each of them appears to
9    be seven 32nds?
10   A Correct.
11   Q And so is that, just for clarity,
12   is that where the technician is taking it
13   from two different spots on the tire?
14   A Correct.
15   Q Okay. And at this point all the
16   tires are marked as acceptable; is that
17   right?
18   A Correct.
19   Q And then there is a flat repair
20   notation there at the bottom right that
21   shows a left rear tire was repaired; is
22   that correct?
23   A It shows that they were

55

1    recommending the repair of the tire.
2    Q Okay. The way you answer that, do
3    you have any knowledge of whether -- I
4    mean, it appears they did repair the tire
5    from the first sheet.
6    A Well, and I was referring to just
7    what it says on this side --
8    Q Okay.
9    A -- the technician recommended.
10   According to the actual billing invoice,
11   it appears they repaired that tire.
12   Q Okay. In any event, we know she
13   paid for it to be repaired; is that right?
14   A Correct.
15   Q Okay.
16   A And that's what I say. When the
17   technician turns this copy in, it's only
18   showing his recommendations. This shows
19   nothing about what the customer actually
20   purchased.
21   Q Okay.
22   A This is strictly a recommendation
23   form, if you will.

56

1    Q When he does that --
2    A This --
3    Q I'm sorry. Go ahead. I didn't
4    mean to cut you off.
5    A Just this side of the form is only
6    showing recommendations, not actual
7    purchases.
8    Q Okay.
9        MS. CANNON: And that's the back
10   page of the second page of Exhibit 3.
11       MR. BRUNER: BFS 36.
12       THE WITNESS: Okay.
13   Q (BY MR. BRUNER:) When they're
14   doing the courtesy check and making the
15   examination reflected in the tires, at the
16   tire services box, is the car on the lift,
17   or is that done -- Does it not have to be
18   done on the lift?
19   A It should be on the lift.
20   Q Okay. Would they -- If you had
21   something like this puncture repair, would
22   the tire, would the car come off the lift
23   until the client approved it, or would

**57**

1  they leave it up on the lift? And there
2  may not be an answer to that, but --
3      A  It would depend.
4      Q  Depend?
5      A  Yeah.
6      Q  Okay. Would BFRC policy allow the
7  client to drive off with a tire with a
8  puncture in it not repaired?
9      A  If the customer didn't buy it, we
10  can't force them to fix it.
11      Q  Okay. I'm going to hand you now
12  what's been marked as Plaintiff's 4, and
13  this appears to be a record from December
14  10th of 2005; is that right?
15      A  Correct.
16      Q  Okay. And this time it appears
17  just to be an oil change; is that right?
18      A  Correct.
19      Q  And in fact, it looks like Ms.
20  Pitts requested no inspection at that
21  time; is that right?
22      A  Correct.
23      Q  And then the only technician, it

**58**

1  appears on this sheet, is K. Young; is
2  that right?
3      A  Correct.
4      Q  The next page, I guess that's a
5  coupon she used. And then on BFS 9, we
6  have the work order; is that right?
7      A  Correct.
8      Q  I've noticed on the work orders, I
9  believe this is an accurate statement with
10  respect to the others, at the top there,
11  where it says *in* -- Are you with me?
12      A  Uh-huh.
13      Q  Out to the side there's an
14  estimated mileage.
15      MS. CANNON: Object to the form. I
16  don't know why you say *estimated*. It's
17  just *mileage*.
18      MR. BRUNER: Well, it has *Est.* in
19  front of it. Is that Eastern Standard
20  Time?
21      MS. CANNON: Where are you -- Oh,
22  I'm sorry. I was looking at the first
23  page.

**59**

1      MR. BRUNER: Oh, no.
2      MS. CANNON: It just has *mileage*.
3      MR. BRUNER: Right. What I'm
4  pointing out is the difference between the
5  two.
6      MS. CANNON: Okay.
7      Q  (BY MR. BRUNER:)  You have a date
8  and then a time, and then an *Est.*  And
9  I'm assuming that's not Eastern Standard
10  Time, because we're not on Eastern
11  Standard Time in Montgomery, but *Est.*
12  *mileage*, I assume that's estimated
13  mileage; is that correct?
14      A  Correct.
15      Q  What is that, and how is that
16  number arrived at?
17      A  That number is arrived at -- The
18  selling associate would ask the customer,
19  "Approximately how many miles are on your
20  car?"
21      Q  Okay. Say that again. I'm sorry.
22      A  At the initial write-up of the
23  ticket, when the customer service teammate

**60**

1  is getting the vehicle information from
2  the customer, "What type of car do you
3  have? What year is your car?
4  Approximately how many miles are on it?"
5  And that's logged into the system.
6      Q  Okay. If we turn back to the front
7  page of this exhibit, the mileage listed
8  there is 48,856 miles, and my first
9  question is where does that mileage --
10      A  That's the exact mileage off the
11  car that the technician or the selling
12  associate would actually log in once the
13  vehicle comes into the shop to be worked
14  on.
15      Q  Well, it was my understanding, and
16  I may have been incorrect, that the work
17  order comes after the customer invoice is
18  started.
19      A  No. The customer invoice, what
20  you're seeing as the invoice here, is the
21  actual billing copy once the vehicle is
22  complete.
23      Q  Okay.

61

1    A This is the first initial write-up,
2 when the customer comes in to the counter.
3    Q Okay.
4    A When they first come into the
5 store.
6    Q Okay. And so that's the customer's
7 estimate of mileage on the vehicle?
8    A Correct.
9    Q And on the back of this exhibit,
10 BFS 10, the courtesy check and vehicle
11 inspection are blank; is that right?
12    A With the exception of the mileage
13 that is actually on the vehicle that is
14 logged in.
15    Q Okay. And five days later -- I'll
16 hand you what's been marked as Plaintiff's
17 Number 5, and that is from December 15th,
18 2005; is that right?
19    A Correct.
20    Q And it's five days after
21 Plaintiff's Exhibit 4, I believe; is that
22 right?
23    A Yes.

62

1    Q And here we have another tire
2 repair - wheel removal and a courtesy
3 check; is that right?
4    A Correct.
5    Q And again this appears it was all
6 done by Mr. Clemons; is that right?
7    A Correct.
8    Q Looking at the work order, it
9 reflects the same information; is that
10 right? Tire repair and courtesy check?
11    A Correct.
12    Q And the flat repair, tire repair
13 here, is there anything on this document
14 that makes you think it was any different
15 than the one reflected in our prior
16 exhibit from 2/26/05?
17    MS. CANNON: Object to the form.
18    A I'm not quite sure what you're --
19 what you're asking there.
20    Q Is there any difference between --
21 From looking at the records -- And I
22 realize you haven't looked at the car or
23 anything, or the tires. But from looking

63

1 at the records, is there any difference
2 between the repair recorded there?
3    A Referring to the type of repair?
4    Q Right.
5    A The type of repair appears to be
6 the same, yes.
7    Q Okay. I believe the only thing
8 different is the price went up a dollar on
9 the -- It looks like the price went up a
10 dollar on the labor and the materials.
11    A Correct.
12    Q Okay. Is there any other type of
13 tire repair that would appear, ever
14 appear, on a customer invoice or work
15 order?
16    A No. If I'm understanding your
17 question right, no.
18    Q Yeah. Okay.
19    A That's the type repair we do in our
20 stores.
21    MS. CANNON: Any other -- I'm
22 sorry. Any other tire repair or any other
23 flat repair?

64

1    MR. BRUNER: I was asking
2 generally, tire repair in general.
3    THE WITNESS: I guess I don't --
4 When you're saying *tire repair*, what are
5 you --
6    Q (BY MR. BRUNER:) And I frankly
7 don't know what other tire repairs are out
8 there, so I'm just asking you.
9    A If you're referring to a puncture
10 repair, you know, where a tire has been
11 punctured by something, that is the type
12 of repair we use.
13    Q Okay. Is there any other type of
14 tire repair that's done at BFRC stores
15 other than puncture repairs?
16    A You could possibly have something
17 where a tire is leaking, and it may be
18 initially written as a tire repair, and
19 you'd replace a valve stem.
20    Q Okay.
21    A Where a stem was leaking, but --
22    Q Now, on the last page of this
23 exhibit, BFS 14, we have the courtesy

65

1 check, vehicle inspection, and that's all
2 blank, isn't it, except for, again, the
3 mileage; is that right?
4     A Correct.
5     Q And in fact, it appears from the
6 records the customer requested or at least
7 did not decline the courtesy check here;
8 is that right?
9     A That's what it appears, yes.
10     Q Okay. Looking at this record, do
11 you know any reason why the courtesy check
12 was not at least filled out on this
13 record?
14     A From looking at this, no.
15     Q Okay. Were there any other -- And
16 you may not remember this. Were there any
17 other records that you reviewed with
18 respect to my clients, this vehicle of my
19 clients, of work done at Montgomery, at
20 the Madison Avenue store?
21     A This vehicle?
22     Q Yeah.
23     A No.

66

1     Q Okay. Do you have any other
2 knowledge whatsoever of any other work
3 done on this vehicle at any time?
4     MS. CANNON: By Firestone or by
5 anyone?
6     MR. BRUNER: By anybody.
7     THE WITNESS: By anybody? No.
8     MS. CANNON: I'm sorry. I guess
9 you're asking Bill if he personally knows
10 that, because obviously y'all have
11 provided some interrogatory responses that
12 indicate there was other work done.
13     MR. BRUNER: Yeah.
14     MS. CANNON: But he has not --
15     THE WITNESS: I personally have not
16 seen anything other than these.
17     Q (BY MR. BRUNER:) Okay. Would
18 there be somewhere a record of the people
19 working at the store on the days these
20 services were provided?
21     A There should be time cards.
22 Correct.
23     Q Okay. Do you know who the manager

67

1 of this store was at the time of these
2 services?
3     A I've been told who the manager was,
4 but I haven't confirmed that, if you will.
5     Q And who have you been told that it
6 is?
7     A A gentleman by the name of Butch.
8     Q Okay. You don't -- That's his
9 first name, I assume?
10     A First name.
11     Q Okay. You don't know Butch's last
12 name?
13     A I don't. I'd have to look it up to
14 find out.
15     Q Okay. Do you know if he's still at
16 the store?
17     A As far as I know.
18     Q Okay. And I assume those records
19 -- Would he have punched a time card, or
20 would there be other records of who was
21 the manager there?
22     A The technician, each teammate
23 actually logs themselves into the time

68

1 clock as they come and go to work.
2     Q Okay. And is that everybody that
3 works at the store, including the manager?
4     A The manager does not use a time
5 card.
6     Q Okay. And is there -- Is it only
7 one manager for the store?
8     A Correct.
9     Q And is he -- I assume he can't
10 always be on duty; is that right?
11     A No.
12     Q Who is in charge of the store when
13 the manager is not there?
14     A Whoever, you know, would be the
15 designate, you know, but there wouldn't
16 necessarily be somebody that was actually
17 assigned the position code of assistant
18 manager.
19     Q Okay. And I gather you don't have
20 any knowledge of who that designate would
21 be on any of these given instances?
22     A No, I do not.
23     Q Okay. We touched on what you did,

69

1   and I think I kind of got into the history
2   of your career before I really got into
3   what exactly you do in this role.
4       A  Uh-huh.
5       Q  And I think we touched on it in
6   broad strokes, but right now you're the --
7   Let me make sure I've got this right.
8   You're the Education Manager?
9       A  Correct.
10      Q  Okay.  Exactly what do you do in
11  that role?
12      A  In that role I will, you know,
13  actually teach varying classes, depending
14  on, you know, what class at the time.  I
15  will assist in roll-out of new projects,
16  if you will, and new training materials,
17  will kind of help keep records on what
18  trainings have been done, you know, by
19  varying people throughout the districts.
20      Q  Okay.  Does that include going to
21  the stores yourself and doing training?
22      A  Typically I do not go directly to
23  stores.  I would go to a district office

70

1   where we have a meeting room, and I would
2   bring people in to me, you know, to
3   conduct training classes.  On occasion I
4   have, you know, gone directly to a store,
5   but that's not the typical way it's done.
6       Q  Okay.  Do you have involvement in
7   setting -- I guess you do -- in developing
8   what training is provided?
9       A  Most of the training that we use is
10  developed through our home office in
11  Bloomingdale.
12      Q  Okay.  Is that BFRC's home office?
13      A  That's BFRC's home office.
14      Q  Okay.  And is it fair to say your
15  primary responsibility then is to
16  implement those trainings?
17      A  Correct.
18      Q  How many -- You used to have the
19  job of Education Coordinator.  How many
20  Education Coordinators do you have under
21  -- And I realize hierarchy may not be
22  exactly right, but how many Education
23  Coordinators now in the Southeast?

71

1       A  As an Education Coordinator,
2   there's only one.
3       Q  Okay.
4       A  There is the Education Manager and
5   then the Education Coordinator.
6       Q  Okay.  And how is that job
7   different than Education Manager?
8       A  Well, the Education Coordinator is
9   responsible, if you will, for the
10  technical education.
11      Q  Okay.  And you told me that before.
12  And as you've described those roles to me
13  just now, has that been consistent from
14  2005 until this time?
15      A  Correct.
16      Q  We discussed the materials, some of
17  these materials that are provided to the
18  technicians and to the stores.  Is there
19  anything that you, in your job as either
20  Education Manager or Education
21  Coordinator, relied on, that's not
22  included in those materials, that go to
23  the technicians and to the stores?

72

1       A  We, on occasion, have had some
2   outside vendors come in and train, teach
3   some classes for us, you know, on varying
4   subjects, depending on what the need would
5   be.  But pretty much anything that, you
6   know, that we have, education-wise, comes
7   out of our Bloomingdale office.
8       Q  Okay.  Is there an Education
9   Manager Manual or a guidebook or anything
10  of that nature?
11      A  No.
12      Q  Okay.  Now, I'm understanding from
13  the interrogatory answers and some of what
14  you've said here today that it is the
15  policy of BFRC that a tire puncture repair
16  be repaired with either a -- Why don't you
17  tell me, so I can get it exactly right.
18      A  Okay.  Either a patch-plug or a
19  patch and filler.
20      Q  Okay.  And the patch-plug is the
21  product with the patch and the plug
22  integrated into one unit; is that correct?
23      A  The filler integrated into one.

---

**73**

1  Correct.
2  Q Okay. And a patch-filler is the
3  two separate pieces; is that right?
4  A Correct.
5  Q Okay. And my understanding is that
6  the indication for the patch-plug and the
7  patch-filler has to do with the angle of
8  the injury?
9  A Correct.
10  Q Okay. And explain that to me.
11  A Well, on a patch and filler, it can
12  be used on any tire repair, you know, as
13  long as it is within the designated place
14  and not, you know, over a quarter inch in
15  size.
16  A patch-plug combination, if you will,
17  that is only used when the angle of the
18  puncture is at less than 25 degrees, 25
19  degrees or less from 90 degrees, from
20  straight in.
21  Q Okay. And you understand that
22  plaintiff's claims here involve -- Our
23  claim is that a string plug was used by

---

**74**

1  itself. Have you been made aware of that?
2  A Yes.
3  Q Okay. First of all, do you have
4  any independent knowledge of whether --
5  And I think, from what I've asked you
6  before, we've established this isn't the
7  case. But do you have any independent
8  knowledge of whether that is the case or
9  not in this case?
10  MS. CANNON: I think what he's
11  asking -- Well, he's already testified
12  that he hasn't seen the tire.
13  MR. BRUNER: Yeah.
14  MS. CANNON: So he's just asking if
15  you know whether his allegation is correct
16  or not.
17  THE WITNESS: No, I do not know if
18  it's correct or not.
19  Q (BY MR. BRUNER:) Okay. And it is
20  my understanding that it is BFRC's
21  position that it is never appropriate to
22  use a string plug repair by itself on a
23  tire.

---

**75**

1  A That is correct.
2  Q Okay. And for the jury's benefit,
3  tell us how that string-only plug repair
4  works.
5  MS. CANNON: I'm sorry. Object to
6  the from. The position is that the
7  string-only repairs are not appropriate,
8  but you're asking how the string-only --
9  Q (BY MR. BRUNER:) Yeah. I mean,
10  I'm assuming you are aware that's been
11  done, from your history in the industry,
12  you know what that type of repair is.
13  A Yeah. It's against our policy to
14  ever use a string-only.
15  Q Right.
16  A Because that is an improper tire
17  repair. It is not the proper way to
18  repair a tire.
19  Q Okay. And why is it improper?
20  A Because it would not properly seal
21  the tire. And I guess I'm going to have
22  to go into an explanation as to why you
23  should do it the other way.

---

**76**

1  The filler itself actually seals the
2  tire, if you will, from the outside in, to
3  keep moisture, dirt, anything from getting
4  into the inner layers of the tire. Okay?
5  The patch itself is what actually seals
6  the air into the inner liner of the tire.
7  Q Okay. And so without -- In the
8  string plug repair by itself, there's no
9  patch on the inner liner; is that right?
10  A Correct.
11  Q And therefore that allows air to
12  get into the inner liner; is that right?
13  A Could you repeat that?
14  Q Without the patch on the inner
15  liner, in a string-only repair -- Are you
16  with me so far?
17  A Uh-huh.
18  Q I believe you testified, and
19  correct me if I'm wrong, that that allows
20  -- That does not seal the inner liner; is
21  that right?
22  A It would allow the air to escape
23  from the inner liner.

---

77

1 　　Q Okay. Allows the air to escape
2 from the inner liner.
3 　　Okay. Has there ever -- You've been
4 at Firestone for some time. You've been
5 at BFRC for some time. Has there ever
6 been any other policy with respect to tire
7 puncture repair while you've been there?
8 　　A No.
9 　　Q In your entire time in the
10 industry, has that been the standard, that
11 a repair which both fills a puncture and
12 seals the inner liner be used?
13 　　A The tire manufacturers have always
14 said that you should fill it that way.
15 　　Q Okay. Do you agree that, in 2005,
16 that was the industry standard for tire
17 puncture repair?
18 　　A Yes.
19 　　Q Okay.
20 　　A To the best of my knowledge, yes.
21
22 　　(Whereupon, a brief recess was taken.)
23

78

1 　　(Whereupon, Plaintiff's Exhibit 6
2 　　was marked for identification.)
3
4 　　Q This is marked as Plaintiff's 6.
5 Do you recognize the document I've marked
6 as Plaintiff's 6 and handed you?
7 　　A Yes, I do.
8 　　Q What is that?
9 　　A That's our Tire Resource Manual.
10 　　Q And how is this used at BFRC?
11 　　A This is used, you know, by store
12 teammates, to help identify, you know,
13 some of the procedures on tires and
14 products that we sell.
15 　　Q And you keep using the term
16 teammates. That's basically employees?
17 　　A Employees. Correct.
18 　　Q BFRC parlance for employees?
19 　　A Correct.
20 　　Q Okay. I want to direct your
21 attention to Page -- It's Page 61 on this,
22 and it's BRC 547. Right there under Tire
23 Repairs, it states, Driving on an

79

1 improperly repaired tire is dangerous. An
2 improper repair can cause further damage
3 to the tire. It may suddenly fail,
4 causing serious personal injury or death.
5 　　Did I read that correctly?
6 　　A Correct.
7 　　Q And is that a correct statement?
8 　　A Correct.
9 　　Q And is that knowledge held by BFRC
10 in 2005, when the repairs we've been
11 talking about here today were done?
12 　　A Correct.
13 　　Q In fact, have you known that the
14 entire time you've been with BFRC?
15 　　A Yes.
16 　　Q Turning to the next page, under
17 Tire Repair Limits, the third bullet point
18 down says, Repairs of all tires, radial
19 and non-radial, must be of the plug and
20 inside patch type. Using plugs alone on
21 any type of tire is not a safe repair.
22 　　Did I read that correctly?
23 　　A Correct.

80

1 　　Q And is that a correct statement?
2 　　A Yes.
3 　　Q And was that BFRC's position at the
4 time, in 2005, when these repairs were
5 done?
6 　　A Yes.
7 　　Q I want to direct your attention two
8 bullet points below that. It says, Any
9 tire repair done without removing the tire
10 from the rim is improper.
11 　　Did I read that correctly?
12 　　A Correct.
13 　　Q And is that a correct statement?
14 　　A Yes.
15 　　Q What does that -- Why is that, if
16 you could explain to us?
17 　　A There's no way to put the patch on
18 the inside of the tire without removing it
19 from the rim.
20 　　Q Okay. I'll direct your attention
21 to Page 63. It's BFS 549. It says,
22 Failure to follow procedures and
23 recommendations could result in sudden

81

1  tire failure, property damage, personal
2  injury or death. And I could go into more
3  for context, but take a look at it. The
4  procedures and recommendations they're
5  talking about there are using the plug and
6  inside patch type of repair; is that
7  right? Is that fair?
8      A Correct.
9      Q Okay. Your location should follow
10  all procedures outlined in this
11  certification program -- I'm sorry. Let
12  me start over. That's not clear.
13      Failure to follow the procedures and
14  recommendations could result in sudden
15  tire failure, property damage, personal
16  injury or death.
17      We can agree that that's referring to
18  having a plug and inside patch type
19  repair; is that right?
20      A That is correct. That is the
21  proper procedure.
22      Q Okay. And that is a correct
23  statement, that failure to follow that

82

1  procedure could result in injury or death;
2  is that right?
3      A Correct.
4      Q Okay. And BFRC knew that to be
5  true in 2005; is that right?
6      A Yes.
7      Q And they knew that to be true
8  during the time you've worked for them; is
9  that right?
10      A Yes.
11      Q And BFRC specifically knew that a
12  string-plug-only repair can result in
13  tread belt separation; is that right?
14      A It's not our policy to use those,
15  no.
16      Q Okay. But what I'm asking, and the
17  answer implied, I guess, no. Did BFRC
18  know that the use of a string-plug-only
19  repair could result in tread separation?
20      MS. CANNON: Object to the form.
21      A I guess I'm not following you, or
22  maybe I didn't -- You know, it's never
23  been our policy to do it with a

83

1  string-only repair, because that's not a
2  correct repair. It will not properly
3  repair the tire.
4      Q Okay. And because that can result
5  in a tire failure that can cause serious
6  injury or death; is that right?
7      A Yes.
8      Q And a string-only repair does not
9  require the tire to be removed from the
10  vehicle, does it?
11      A It would not require it, no.
12      Q Okay. In fact, it doesn't even
13  have to be put on the lift to have that
14  type of repair done, does it?
15      A It would not have to be, depending
16  on the location of puncture.
17      Q Okay. And it certainly involves
18  less time than doing a proper repair,
19  doesn't it?
20      A I would think so.
21      Q Okay. By very definition, it
22  involves less materials; is that right?
23      A Yes.

84

1      Q Okay. Have you been aware, at your
2  time at BFRC, of any stores that were
3  performing -- and I'm talking about BFRC
4  stores -- that were performing string-only
5  repairs?
6      A No, I have not.
7      Q Okay. Before this lawsuit was
8  filed, did you have, or did anybody at
9  BFRC, to your knowledge, have any
10  indication that the Madison Avenue store
11  in Montgomery was performing
12  string-only-type repairs?
13      A No.
14      Q Since this lawsuit has anything
15  been done to determine whether the Madison
16  Avenue store in Montgomery is still
17  performing string-only-type repairs?
18      MS. CANNON: Object to the form.
19  There's no foundation laid that they are
20  performing those to still be performing
21  those.
22      Q (BY MR. BRUNER:) You can still
23  answer it.

**85**

1    A  I don't know of them ever
2  performing a string-only repair.
3    Q  Okay.  Has anybody, to your
4  knowledge, asked them if they have
5  performed string-only repairs in the past?
6    A  Not to my knowledge personally, no.
7    Q  Okay.  Has anybody, to your
8  knowledge, contacted customers who had
9  tire repairs done at the Madison Avenue
10  store, to see if their tires were repaired
11  with a string-only?
12    A  Not to my knowledge personally, no.
13    Q  Okay.  Do you have any knowledge of
14  you having any record of Mr. Clemons ever
15  having performed a string-only repair on a
16  tire?
17    A  Not to my knowledge personally, no.
18    Q  Okay.  Do you know if anybody has
19  ever -- Aside from what you would know
20  from lawyers.  I don't want to know what
21  your lawyers told you.  Okay?
22    A  I understand.
23    Q  Do you know if anybody in your

**86**

1  organization has ever discussed with Mr.
2  Clemons whether he has performed
3  string-only repairs on tires?
4    A  To my knowledge personally, no.
5
6    (Whereupon, Plaintiff's Exhibit 7
7    was marked for identification.)
8
9    Q  I've handed you what I've marked as
10  Plaintiff's Number 7, Mr. Sheridan, and I
11  want to direct your attention to
12  Interrogatory Number 7 therein.  It's on
13  Page 4.
14    The interrogatory asks, *Identify and*
15  *describe with specificity all efforts*
16  *undertaken by BFRC to make sure that its*
17  *policies and procedures regarding the*
18  *repair of punctures in passenger and light*
19  *truck tires were followed by its retail*
20  *locations during the years 2003 to 2006.*
21    And then I don't need to read it, but
22  I'll show you there, underneath, the
23  answer lists several, a number of

**87**

1  different training courses; is that right?
2    A  Correct.
3    Q  Okay.  And the first one there is
4  *Tire Demount*, and then it has *Mount and*
5  *Repair*.  Is that two different, or is *Tire*
6  *Demount* one --
7    A  That is all one module, one book.
8    Q  *Tire Demount, Mount and Repair*; is
9  that correct?
10    A  Correct.
11
12    (Whereupon, Plaintiff's Exhibit 8
13    was marked for identification.)
14
15    Q  Okay.  And I don't want to walk
16  through the whole thing with you, but let
17  me hand you a copy of what I've been
18  provided with that title.
19    Is that *Tire Demount, Mount and*
20  *Repair*?
21    A  Yes, it is.
22    Q  And that's a workbook, and is that
23  -- or you tell me.  Is that a workbook, is

**88**

1  it part of a class, or is it --
2    A  That is a self-study module, what
3  we deem as a self-study module.
4
5    (Whereupon, a discussion was held off
6    the record.)
7
8    Q  I'm sorry.  You were answering.  Do
9  you need me to repeat the question?
10    A  Please.
11    Q  How is this -- It looks like a book
12  here.  How is that used?
13    A  That is a self-study, a self-paced,
14  self-study module.
15    Q  Okay.  And is that required to be
16  used by BFRC?
17    A  Yes, it is, by the technicians.
18    Q  Okay.  Is it part of initial
19  training or regular training or --
20    A  It's part of regular training.
21    Q  Okay.  And I think you can agree
22  with me, to eliminate the necessity of
23  going through all these documents, there's

**89**

1  not going to be a BFRC document that we go
2  through that's going to endorse the use of
3  a string-only repair; is that right?
4       A  No, there is not.
5       Q  Okay.  Is there a -- You said it's
6  a self-study manual.  Is there a classroom
7  component of *Tire Demounting and Mounting*?
8       A  No, there is not.
9       Q  Okay.  The next thing in the
10  interrogatories, and this is on Page
11  Number 4 of Exhibit 8, or Exhibit 7, I'm
12  sorry, is Quick Start.  What is Quick
13  Start?
14       A  That is another self-paced module.
15  And I say *self-paced.*  Self-paced,
16  self-study.
17       Q  Okay.  How do you make sure your
18  technicians complete these self-paced
19  modules?
20       A  Through monthly reporting that
21  shows completions.
22       Q  How does the monthly reporting do
23  that I guess is what I'm getting at.

**90**

1       A  Well, it's actually a monthly
2  reporting, as well as now, and in 2005,
3  the stores would get an e-mail as somebody
4  completed, you know, a particular course.
5       Q  Would get an e-mail from who?
6       A  From home office.
7       Q  Okay.  How did the home office know
8  that the person had completed the course?
9       A  It would be recorded through the
10  computer system.
11       Q  Okay.  And I guess what I'm getting
12  at, is there a test they take and send in,
13  or is there --
14       A  Correct.  Yes, there is.
15
16       (Whereupon, Plaintiff's Exhibit 9
17       was marked for identification.)
18
19       Q  I'll hand you what's been marked as
20  Plaintiff's Exhibit 9.  Is that Quick
21  Start?
22       A  Yes, it is.
23       Q  Okay.  Is that the whole thing?

**91**

1       A  Yes, I assume, without looking page
2  by page.
3       Q  Sure.
4       A  But I assume it's the whole thing.
5       Q  I understand.  And again this is
6  all a self-study program; is that right?
7       A  Correct.
8       Q  Okay.  What about *You Auto Know*,
9  which is the next thing listed there?
10       A  That is also a self-paced,
11  self-study.
12       Q  Okay.  And I believe this one,
13  there are some videotapes associated with
14  it; is that right?
15       A  Correct.
16       Q  Is there any classroom component to
17  it, other than perhaps sitting in a
18  classroom and watching the videotape?
19       A  There is no classroom component to
20  it.
21
22       (Whereupon, Plaintiff's Exhibit 10
23       was marked for identification.)

**92**

1
2       Q  I'll hand you what's been marked as
3  Plaintiff's 10.  Is that the written
4  portion of that study module?
5       A  Yes, it is.
6       Q  Okay.  And when is that designed to
7  be provided to the technicians in the
8  course of their working for Firestone?
9       A  Early on in their career.
10       Q  Okay.  The next thing listed here
11  in this interrogatory is new employee
12  training.
13       A  Correct.
14       Q  And what is that?
15       A  We have a new teammate orientation
16  program that we started -- I was trying to
17  think.  I'd hate to get pinned down on a
18  year as to when we started that, but it
19  was in place in '95.
20       Q  Okay.
21       A  Anybody prior to that may or may
22  not have attended.
23       Q  Okay.

93

1    A Excuse me. I said '95. '05.
2    Q And was there any written portion
3    of it, or any manual or book like we have
4    here?
5    A No, not -- Well, yes, there was,
6    but it didn't get into real specific
7    services.
8    Q Okay. The interrogatory further
9    states that periodic meetings may also be
10   held at the district level with Store
11   Managers and at the store level with
12   technicians, which may include discussions
13   of policies and procedures.
14   I believe you were describing, at
15   least to some extent, those meetings to me
16   before; is that right?
17   A In that I said I went out to
18   district level and held certain training
19   classes.
20   Q Okay. Do we have a record anywhere
21   of where either the manager of this store
22   attended such a periodic meeting or where
23   training was provided to this store on

94

1    Madison Avenue in Montgomery?
2    A We'd have to once again look at
3    their particular training history to see
4    what courses any individual had gone to.
5    Q So the way to look at that would be
6    to look at the records of individuals'
7    training at the store?
8    A That would be the easiest way to do
9    it, yes.
10   Q To your knowledge would there be a
11   record somewhere of training provided to
12   the Madison Avenue store?
13   A That store specifically?
14   Q Sure.
15   A As far as entire store, no.
16   Q Okay. What kind of controls does
17   BFRC have in place so that it would know
18   if one of its stores or one of its
19   technicians were performing string-only
20   repairs?
21   A I guess I don't fully understand
22   what you're asking.
23   Q And there may not be any, but

95

1    you've shown me, and we can talk a little
2    more, we'll go more into Mr. Clemons's
3    training, but we've talked about the
4    training. Are there any institutional
5    controls in place at BFRC to ensure that
6    string-only repairs aren't being done at
7    its stores?
8    A Nothing other than, you know,
9    training the people the proper way to do
10   it, and then, you know, obviously, if
11   someone is ever seen trying to do one
12   improperly, they're stopped.
13   Q Okay. But again you don't have any
14   knowledge of any specific instance where
15   you know of one being done at a BFRC
16   store; is that right?
17   A No, I have no knowledge personally
18   of one being done.
19   Q Have we discussed everything that
20   BFRC was doing in 2005 to make sure that
21   its policies with respect to tire puncture
22   repair were being followed?
23   A As far as I know personally, yes.

96

1    Q Okay. What about as a
2    representative of BFRC?
3    A Yes.
4
5    (Whereupon, Plaintiff's Exhibit 11
6    was marked for identification.)
7
8    Q If you don't mind, Mr. Sheridan,
9    I'm going to walk over here. This is my
10   only copy of this.
11   A Okay.
12   Q I'm showing you what's marked as
13   Plaintiff's Exhibit 11, and this is, I
14   believe, what we've determined today is
15   the training history of Mr. Clemons; is
16   that right?
17   A Correct.
18   Q And this is generated when you, I
19   guess, you type his name into the
20   computer, the training history, and this
21   comes up?
22   A Correct, and pull up his history.
23   Q Okay. I'm going to start down at

**97**

1  the bottom. We have three entries at
2  3/21/95, and these appear to be the first
3  entries for Mr. Clemons; is that right?
4      A  Correct.
5      Q  And these are the *You Auto Know*,
6  Volumes 1, 2, and 3; is that correct?
7      A  Correct.
8      Q  And that's what we discussed here
9  today?
10     A  Correct.
11     Q  7/11/96, the next course is CFE
12  Maintenance Tech. What is that?
13     A  That is a -- The *CFE* stands for
14  Certified for Excellence. It's just our
15  training program, and it covers routine
16  maintenance services, and the tech
17  designates he took the technical portion
18  of that book.
19     Q  Okay. And the next one is
20  10/28/96. Is that *CSDS Self-Study Guide*?
21     A  Correct.
22     Q  What is that?
23     A  That is the Customer Service

**98**

1  Delivery System. That's the process, if
2  you will, that we use when a vehicle comes
3  to the store itself, how it's processed
4  through the store.
5      Q  Does part of that include what we
6  talked about earlier, how the work orders
7  and invoices are generated?
8      A  The work orders are generated.
9  Correct.
10     Q  Okay. Then the next one is
11  5/5/1997, and it's *MAP roll-out meeting*.
12  What is that?
13     A  That's the Motorist Assurance
14  Program. It's when we joined the Motorist
15  Assurance Program. We had a roll-out
16  meeting to inform all the technicians of
17  the MAP program.
18     Q  And what is Motorist Assurance
19  Program?
20     A  It's a program that's an
21  independent program that any auto repair
22  facility can use, that sets up guidelines,
23  as far as the recommendations for

**99**

1  replacement of worn parts.
2      Q  Okay. And the next one is
3  11/17/99, *CFE Tire Demount, Mount and
4  Repair*. I believe that's what we looked
5  at earlier; is that right?
6      A  Correct.
7      Q  Okay. The next one is 3/6/01, and
8  that's the *e-CSDS Self-Study*?
9      A  Correct.
10     Q  Is that the same thing as the
11  previous --
12     A  Correct. The *e* standing for
13  electronic. It's when we changed our
14  computer system over to an electronic
15  system.
16     Q  3/14/2001, *Mastercare roll-out*?
17     A  Correct.
18     Q  What is that?
19     A  That is just -- It goes over our --
20  You know, Firestone stores are considered
21  Mastercare. It's one of our -- It's the
22  name of our brand, if you will. It's a
23  type of service that we offer the

**100**

1  customers.
2      Q  Okay. 11/18/02, *Tire Adjustment
3  Procedures Manual*. What is that?
4      A  It's just a manual that shows the
5  proper procedures for adjusting one of our
6  brand of tires.
7      Q  Okay. On 6/4/2003 he took
8  *Impressions are Forever*. What is
9  *Impressions are Forever*?
10     A  That's another piece of Mastercare.
11  It was just a roll-out for all our
12  employees.
13     Q  Okay. 11/3/2003, *CFE Tire Care and
14  Maintenance*. What is that?
15     A  Correct. At the time that was a
16  standalone self-study module on tire care
17  which talked about pressures and rotations
18  and maintaining tires.
19     Q  Okay. What about 11/3/03 -- Well,
20  several of these are 11/3/03, but the next
21  one on 11/3/03 is *Run Flat Certification*?
22     A  Correct. That was about the Run
23  Flat tires.

101

1    Q Okay.
2    A And tire pressure monitoring
3 systems.
4    Q Okay. The next one is 11/3/03,
5 *CFE*, and then it says *STR*. I guess that's
6 steering, suspension, and alignment?
7    A Correct.
8    Q What is that?
9    A He took the sales portion of the
10 *Steering, Suspension, and Alignment*, that
11 described steering components, alignment
12 components.
13    Q Okay. 11/3/2003, *CFE Heating and
14 Cooling Sales*. Same thing?
15    A Same thing, with heating and
16 cooling systems.
17    Q 11/12/03, *Starting and Charging*.
18 Same thing?
19    A Correct.
20    Q Okay. Same date, and brakes,
21 11/12/03, *Brake Sales*. Same thing?
22    A Correct.
23    Q Okay. 11/12/03, *Manufacturers*

102

1 *Scheduled Maintenance*. What is that?
2    A That was talking about the
3 manufacturers scheduled maintenance
4 programs, where the manufacturers
5 recommend certain services be done at
6 certain mileages.
7    Q Okay. 11/12/2003, *Tire Adjustment
8 Procedures Manual*?
9    A That was just an updated or a --
10 where he took, you know, the updated
11 manual of the *Tire Adjustment Procedures*
12 he had taken earlier.
13    Q Okay.
14    A Where we had had some revisions.
15    Q 9/12/2005, *Play it Safe*. What is
16 that?
17    A That is just safety in the
18 workplace.
19    Q Okay.
20    A Self-paced module.
21    Q Okay. 11/15/05, *Beyond Repair*.
22 What is that?
23    A That is a DVD on, you know, taking

103

1 care of customers' cars to make sure that,
2 you know, we don't, you know, have any
3 issues with, you know, damaging a
4 customer's car or anything like that.
5    Q Okay. 11/15/2005, *Torque Talk*?
6    A That is on properly torquing lug
7 nuts.
8    Q Okay. 11/9/06, *Beyond Repair*.
9 Same thing as it was before?
10    A He did the same thing. Uh-huh.
11    Q And I said 11/9/06. I was
12 incorrect. That was 1/9/06. On 1/9/06
13 again, *Torque Talk*?
14    A Correct.
15    Q On 3/29/06, *Motorist Assurance
16 Program Cert*?
17    A Correct.
18    Q What's that? I believe we saw
19 something similar down there below --
20    A That's where he actually did a
21 self-paced study module and took a test on
22 it.
23    Q Okay. What about 4/13/06, *LP/LD*

104

1 *Tire Mounting Hands-On*?
2    A That one and the one above it, the
3 tire mounting seminar, one is a seminar on
4 mounting low-profile, large-diameter
5 tires. The hands-on portion is where they
6 physically perform the mounting of the
7 low-pressure, or low-profile, excuse me,
8 large-diameter tires.
9    Q Okay. 7/24/06 he gets Quick Start?
10    A Correct.
11    Q And that was -- I believe we said
12 that was a -- Wasn't that for technicians
13 starting out?
14    A Yes, it is.
15    Q Why would he be getting that in
16 July of last year?
17    A For whatever reason, he had not,
18 you know, taken that. I don't remember
19 the exact date on when we first started
20 Quick Start. It may not have been
21 something that was available when he was
22 first hired.
23    Q Okay.

105

1    A And so it was just kind of catch up
2    and, you know, get that program done.
3    Q Okay. And then you have *Torque*
4    *Talk again,* 8/21/2006; is that right?
5    A Yes.
6    Q And then 2/20/2007 has *Reaffirm*
7    *Tire Reg Policy;* is that right?
8    A Correct.
9    Q And do you know what that is?
10   A That is just reaffirming that we
11   are going to document the tire DOT numbers
12   on any new tires that we sell.
13   Q Okay.
14   A That he understood the policy.
15   Q Okay. So that doesn't have
16   anything to do with tire repair?
17   A Not on repair. It's only on new
18   tire sales.
19   Q When was this run -- I see the fax
20   at the top, but it's printed 4/20/07.
21   Okay. So this was printed today.
22   A Yes, sir.
23   Q And this reflects all the training

106

1    Mr. Clemons has been given by BFRC?
2    A Correct. All formal training, yes.
3    Q Okay. Is there a -- Does BFRC keep
4    a personnel file on its technicians?
5    A Yes, it does.
6    Q Okay. And where is that, and who
7    is that kept by in the company?
8    A That should be kept at district
9    level, at the district office.
10   Q And tell me district again. Are
11   you -- I think you said you're zone;
12   right?
13   A I work for the zone. Correct.
14   Q Okay. I'm going to get into the
15   organizational charts I have, but how does
16   that break down from zone to district?
17   A In our particular zone, there are
18   13 district offices across the Southeast.
19   Q Okay. What district office would
20   be over our Madison Avenue store?
21   A That would be the Birmingham
22   District Office.
23   Q Okay. And do you know what the

107

1    Birmingham District Office encompasses?
2    A I can give you a rough idea.
3    Q Best judgment. Yeah.
4    A As far as store locations?
5    Q Yeah.
6    A The stores in the Birmingham area,
7    Montgomery, Dothan, Tuscaloosa,
8    Huntsville, Columbus, Georgia. That's a
9    rough idea. We may have an outlying
10   store, you know, one store in a smaller
11   town, but --
12   Q Is there somebody that runs that
13   district, that's responsible overall for
14   that district?
15   A There's a District Manager for that
16   district, yes.
17   Q Do you know who that is?
18   A That's Ken Hall.
19   Q Ken Hall?
20   A Uh-huh.
21   Q Are there any -- You're with BFRC
22   Education. Are there any BFRC Education
23   personnel at the district level, or do you

108

1    have to get to zone before there's
2    somebody with that designation?
3    A Some of the people in the district
4    office, you know, either the District
5    Manager or the Assistant District Manager,
6    could conduct some training classes. We
7    also have, in this district, what we call
8    a District Technical Trainer, who is an
9    individual who is actually a store
10   teammate that works in stores, that would
11   actually help teach some of the technical
12   training classes.
13   Q Okay. Is there, at BFRC, is there
14   a Safety Division or Safety Department?
15   A Yes, there is.
16   Q Okay. And what is the name of
17   that?
18   A That is the Loss Prevention.
19   Q Loss Prevention. Okay. And is
20   that at the district and zone levels or --
21   A At zone level we have a Loss
22   Prevention Manager.
23   Q Okay. And who is that?

109

1    A That is Brian Sutton.
2    Q Okay. And he's in Marietta with
3 you --
4    A Correct.
5    Q -- at zone headquarters?
6    A Correct.
7    Q Okay. I know you said you report
8 to Operations --
9    A Correct.
10   Q -- at zone. Is Operations in
11 charge of the whole zone, is or is there
12 somebody that's --
13   A There's a Zone Vice-President in
14 charge of the entire zone, if you look at
15 the organizational chart.
16   MR. BRUNER: Okay. Let's take a
17 look at that while we're on it.
18
19   (Whereupon, Plaintiff's Exhibit 12
20    was marked for identification.)
21
22   Q (BY MR. BRUNER:)   We've marked
23 this as Plaintiff's Exhibit 12.

110

1 Plaintiff's 12 is two documents, and the
2 first appears to be an organizational
3 chart for BFRC; is that right?
4    A Correct.
5    Q And so we see there, at the very
6 top, the Chairman and CEO of Bridgestone
7 Americas Holding. And then beneath him on
8 this chart is L.J., I guess, Magee?
9    A Correct.
10   Q Okay. Executive Vice-President of
11 Bridgestone Americas Holding, and Chairman
12 and CEO and President of BFRC; is that
13 right?
14   A Correct.
15   Q Okay. And then you follow his line
16 down, and it goes to the various zones; is
17 that right? Of BFRC?
18   A It would eventually go down to the
19 various zones at the bottom, yes.
20   Q Okay.
21   A Sorry.
22   Q And there you have your Southeast
23 Zone, and you have Southeast Zone V.P.,

111

1 looks like R.E. Seagle, Jr.?
2    A Correct.
3    Q Does he work out of your office?
4    A Yes, he does.
5    Q Okay. And then operation -- Do you
6 know -- Have you ever seen another chart
7 there, where it says *BFRC 8, See Chart*,
8 underneath?
9    A Have I seen another chart there?
10   Q I'll show you exactly -- See on our
11 first page there?
12   A Okay.
13   Q Where we were, at R.E. Seagle?
14   A Correct.
15   Q V.P. Southeast Zone?
16   A Uh-huh.
17   Q And then you drop down underneath
18 that, and it says, *See Chart*?
19   A Uh-huh.
20   Q Hope, I just haven't gotten a
21 chance to write you a letter. You may
22 have this. You may be able to provide it,
23 but I'm just asking him. Is there, to

112

1 your knowledge, a chart of the Southeast
2 Zone?
3    A I believe there is. I think I've
4 seen one. I know who the department heads
5 are that go under him. I know that.
6    Q All right.
7    A I'm sure there must be a chart
8 somewhere.
9    Q What does Mr. -- Did you say it was
10 Ken Hall --
11   A Uh-huh.
12   Q -- in Loss Prevention?
13   A No. Ken Hall is the District
14 Manager for the Birmingham District
15 Office.
16   Q Okay. Who did we say was Loss
17 Prevention Manager in the zone?
18   A Brian Sutton.
19   Q Brian Sutton. Okay. My mistake.
20 What, to your understanding, are generally
21 Mr. Sutton's duties?
22   A They have to deal with claims and,
23 you know, loss prevention, preventing

**113**

1 claims, obviously.
2 Q Okay.
3 A Claims, whether they are, you know,
4 workmen's comp or garage claims.
5 Q Okay. Would he also be the person
6 most knowledgeable with respect to
7 lawsuits that have happened?
8 A Personally, I'm not sure.
9 Q Okay. In your role do you ever get
10 reports of -- Let's go with complaints
11 first about repairs.
12 A No, I do not.
13 Q Okay. It's not part of your job to
14 evaluate?
15 A No, it is not.
16 Q Okay. And would the same be true
17 with respect to lawsuits?
18 A Correct.
19 Q Okay. Do you have any -- And we
20 may have covered this going through, but I
21 want to make sure. Do you have any
22 knowledge of any lawsuits again BFRC for
23 tire repair?

**114**

1 A Personally, I do not.
2 Q Okay. And it doesn't sound like
3 you necessarily would, if such a lawsuit
4 was made, unless, of course, you're here
5 testifying; is that right?
6 A Correct.
7 Q Okay. And so the fact that there
8 were lawsuits, the fact that there were
9 complaints, and the natures of those
10 complaints and lawsuits, are not something
11 used by BFRC Education, at least in the
12 Southeast Zone; is that right?
13 A That's correct.
14 Q Do managers go through any special
15 type of training by virtue of being a
16 Store Manager?
17 A Yes, they do.
18 Q And what type of training is that?
19 A They have different administrative
20 trainings that they would go through,
21 teaching them the paperwork. Then they
22 will also go through a two-week Store
23 Manager Business Development Workshop

**115**

1 that's conducted by our home office, BFRC,
2 in Bloomingdale.
3 Q Is that stuff they go through
4 before they're made managers or as part of
5 being made managers?
6 A Yes.
7 Q And is there a name to that
8 program, or is it a number of programs?
9 What would I specify if I requested that?
10 A The name of the two-week program is
11 the Store Manager Business Development
12 Workshop.
13 Q Who would be the Store Manager's
14 direct superior?
15 A The District Manager.
16 Q Okay. What's your understanding of
17 the relationship of BFRC to Bridgestone
18 Americas Holdings?
19 A Well, they're our parent company
20 obviously.
21 Q Okay. Do they provide you, *you*
22 being BFRC, with any of the materials you
23 use to educate technicians, stores, on

**116**

1 tire puncture repair?
2 A It's my understanding all our tire
3 puncture repair materials come from our
4 department in the RMA, based on RMA. And
5 I say *our department*. BFRC Education
6 Department.
7 Q Okay. So BFRC basically uses what
8 the RMA puts out?
9 A Correct.
10 Q And for clarification, RMA is the
11 Rubber Manufacturers Association; is that
12 correct?
13 A Correct.
14 Q Of which I believe Bridgestone
15 Americas Holdings is a member, is it not?
16 A Correct.
17 Q Are there any other -- And there's
18 another one. I can't remember what it's
19 called. But are there any other
20 professional organizations of which
21 Bridgestone Americas Holdings or BFRC are
22 members of?
23 A I personally do not know.

**117**

1     Q Okay. In the course of your job,
2 do you interact on a regular basis with
3 any personnel from Bridgestone Americas
4 Holdings?
5     A No. I say that. It would be
6 rarely. I may see somebody and say hello,
7 but I do not interact as far as
8 discussions with them, no.
9     Q Okay. What about Bridgestone
10 Firestone North American Tire?
11     A Here again, other than possibly
12 seeing somebody in a meeting and saying
13 hello, no.
14     Q Okay. Do you or anybody in your
15 office subscribe to or get any trade or
16 professional journals?
17     A Yes, I have seen some around the
18 office. Yes.
19     Q And what are those?
20     A I think the one that I most
21 commonly see, I believe the name of it is
22 *Tire Business.* I receive *Motor Age.*
23

**118**

1
2     (Whereupon, a brief recess was taken.)
3
4     Q Mr. Sheridan, have y'all, has BFRC
5 ever done any studies of the effectiveness
6 of the training that it provides?
7     A I am personally not aware of any.
8     Q Okay. And as BFRC's representative
9 are you aware of any?
10     A Nothing other than, you know, test
11 scores on tests that we've given.
12     Q Okay.
13     A That kind of verification.
14     Q And I said studies that BFRC has
15 done. Do you know of any that have been
16 done of BFRC's training by anybody else?
17     A None that I know of.
18     Q Okay. Are you familiar with the
19 RMA wall chart?
20     A Yes, I am.
21
22     (Whereupon, Plaintiff's Exhibit 13
23     was marked for identification.)

**119**

1     Q And I believe you testified earlier
2 that RMA policies and procedures were the
3 source of BFRC's policies and procedures?
4     A Correct.
5     Q I'm showing you what's been marked
6 as Plaintiff's 13. Do you recognize that
7 as an RMA wall chart?
8     A Yes, I do.
9     Q Okay. And do you agree with me
10 that that describes the correct procedure
11 for tire puncture repair? And take all
12 the time you need.
13     A Yes. There's two small
14 discrepancies. One, on our procedure,
15 they are -- RMA is showing on Step 4
16 actually using what appears to be either
17 an electric or air-operated drill to ream
18 the tire with. We have a manual tire
19 reamer.
20     Q Okay.
21     A I mean, it's a small point there.
22     Q Okay.
23     A And the procedure shown appears to

**120**

1 be a patch-plug-type procedure that
2 they're showing. But other than that, the
3 same procedure would almost follow with
4 using a filler and patch.
5     Q Okay. So they're showing one of
6 the two options that we --
7     A Correct.
8     Q That you testified earlier were
9 appropriate; is that right?
10     A Correct.
11     Q Okay. And I believe I've seen some
12 Firestone adaptations of this chart in the
13 materials provided. Have you seen those?
14     A Correct. Yes.
15     Q Okay. And generally those are the
16 same, albeit some small differences, those
17 are the same procedures?
18     A Yes.
19     Q Okay. And again that's the
20 industry standard in tire puncture repair?
21     A Yes, it is.
22     Q I don't think I have anything else.
23 Thank you for your time today.

**121**

1    A  Okay.  Thank you.

2

3

4        FURTHER DEPONENT SAITH NOT

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**122**

1         C E R T I F I C A T E

2

3    STATE OF ALABAMA  )

4    JEFFERSON COUNTY  )

5

6       I hereby certify that the above and

7   foregoing deposition was taken down by me

8   in stenotype, and the questions and

9   answers thereto were transcribed by means

10  of computer-aided transcription, and that

11  the foregoing represents a true and

12  correct transcript of the testimony given

13  by said witness upon said hearing.

14      I further certify that I am neither

15  of counsel, nor of kin to the parties to

16  the action, nor am I in any wise

17  interested in the result of said cause.

18

19

20

21      ——————————

       JULIE A. CARROLL

22

23

# EXHIBIT D



**Bradley Arant**
BRADLEY ARANT ROSE & WHITE LLP

ONE FEDERAL PLACE
1819 FIFTH AVENUE NORTH
BIRMINGHAM, AL 35203-2119
205.521.8000   FAX 205.521.8800
WWW.BRADLEYARANT.COM

Hope T. Cannon

Direct Dial: (205) 521-8722
Direct Fax: (205) 488-6722
hcannon@bradleyarant.com

May 11, 2007

**VIA FACSIMILE AND U.S. MAIL**
Robert P. Bruner, Esq.
Lanny Vines & Associates, LLC
2142 Highland Avenue South
Birmingham, AL 35205-4002

   RE: *L. Joe Pitts, as administrator of the Estate of Sandra Ann Spence Pitts, deceased*
     *v. Bridgestone Americas Holding, Inc., et al.*
     In the United States District Court for the Middle District of Alabama, Northern
     Division, Case No. 2:06cv1008-ID-SRW

Dear Bo:

   Please accept this letter as BFRC's reply to the discovery matters raised in your April 27, 2007, letter. While we do not agree with all of your positions, we offer the following compromise:

   1.  Personnel Files

   With respect to documents containing information about BFRC personnel, you seek the production of personnel files for Mr. Clemons and Mr. Young, as well as documents identifying employees who were working in the subject store on February 26 and December 15, 2005.

   At the outset, BFRC notes that its employees have a privacy interest *vis a vis* third-parties in the contents of their personnel files, which can contain confidential medical, insurance and other personal information. BFRC and its employees both have legally-recognized interests in preserving the confidentiality of this sensitive information. Moreover, such information is only discoverable where relevant, and may be protected under Rule 26(c) where necessary. BFRC protects its employees' privacy rights in this regard and produces information from personnel files only upon the entry of an appropriate protective order.

   BFRC, however, will produce the personnel file of Mr. Clemons. Mr. Clemons, as you know, is the technician who worked on the left rear tire that was on the subject vehicle on February 26, 2005. As such, BFRC recognizes that information contained in Mr. Clemons' personnel file could have some relevance in this matter. BFRC will produce Mr. Clemons' personnel file pursuant to the entry of an appropriate protective order. I will forward a proposed order to you shortly for your review.

Robert P. Bruner, Esq.
May 11, 2007
Page 2

BFRC does not believe that information from Mr. Young's personnel file is relevant. Mr. Young, as you know, did not perform any tire repairs for the subject vehicle. Thus, it is unclear how information about Mr. Young's training and past job performance could be relevant to your client's claims in this case. Thus, given the privacy interests involved, BFRC believes that it would be inappropriate at this time to unnecessarily invade Mr. Young's privacy by producing the contents of his personnel file. However, if you can state why you feel such information is relevant to your client's claims in this case, we can re-consider your request.

You have also requested "all documents" which identify BFRC employees who were working in the subject store on February 26, 2005, and December 15, 2005. As set forth in BFRC's Response to Request for Production 5, this request is overly-broad. However, in the spirit of cooperation, BFRC will produce a copy of a time report for the date of February 26, 2005, which shows all the employees who were working on that day as well as the times when they clocked in to work and clocked out of work. Since the December 15, 2005, date is not the date of the alleged subject repair, we are not sure how documents relating to employees present at the store on that date could be relevant.

2.    Claims and Lawsuit Information

You have also requested that BFRC produce "any and all" documents evidencing lawsuits from 2000 to 2005, for all stores, involving negligent or wanton tire repair, as well as "all complaints of any type or nature concerning any alleged improper tire repair." *See, e.g.* Requests for Production 10, 11. You note in your letter that BFRC's objections and responses and your position with respect to claims and lawsuits are essentially the same. Thus, they will be treated together here.

First, BFRC notes that the subject store experienced no lawsuits regarding puncture repairs during the responsive timeframe. *See* BFRC's Answer to Interrogatory 10. Thus, there is no lawsuit information for BFRC to produce with respect to the subject store. To the extent you seek claims and lawsuit data related to stores other than the subject store, your sweep is overly-broad and would require an unduly burdensome search. BFRC owns over 2,000 stores nationwide, each of which could potentially maintain documents related to "complaints" by customers about tire repairs. Given the absence of lawsuits regarding puncture repairs filed against the subject store, the burden of searching each of the over 2,000 other stores would greatly outweigh any possible benefit.

Second, the repair at issue here was made allegedly in the subject store, not any other stores. It is unclear how repairs made by other technicians at other stores are relevant to the repair allegedly made at the subject store and the alleged subsequent failure of the subject tire. Thus, we do not believe that claims and lawsuit information related to stores other than the subject store are relevant here and maintain our objections.[1]

---

[1] We disagree with your reliance on APJI Civil 11.18. That pattern jury instruction does not define the scope of discovery in this case. It is clear that a damages award based even in part upon a jury's desire to punish a defendant for "wrongs" inflicted on parties not before the court would amount to an unconstitutional taking without due process. *See, e.g. Philip Morris USA v. Williams*, — U.S. —, 127 S.Ct. 1057 (2007). Thus, your suggestion that

Robert P. Bruner, Esq.
May 11, 2007
Page 3

Third, your suggestion, that claims and lawsuits against other stores may show BFRC's "notice of negligent/wanton tire repairs taking place at their stores," is entirely speculative. As BFRC explained in its responses, it does not organize its files by type of claim. Thus, to even begin to respond to your requests BFRC would be required to conduct a file-by-file examination to determine if there have been any claims or lawsuits of the types you seek. Given that the existence of other claims or lawsuits, if there are any, is irrelevant to damages and is speculative at best, it would present an undue burden for BFRC to conduct the costly search your requests would require.

We hope this letter addresses the discovery matters outlined in your April 27, letter. However, please feel free to contact me at your earliest convenience to discuss any questions or concerns you may still have.

Sincerely,

*Hope T. Cannon/cja*

Hope T. Cannon

damages in this case somehow hinge upon "wrongs" you believe BFRC may have committed elsewhere is misplaced.

# EXHIBIT E



# LANNY VINES
## & ASSOCIATES, LLC
#### ATTORNEYS AT LAW

Bo Bruner
Direct: (205) 930-6983
Facsimile: (205) 933-1272
Email: bbruner@lannyvines.com

April 27, 2007

**VIA FACSIMILE ONLY**
Hope T. Cannon, Esq.
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104

RE:    *L. Joe Pitts, as Administrator of the Estate of Sandra Ann Pitts vs. Firestone Tire & Service Centers, et al.*

Dear Hope:

During the deposition last Friday you told me that I could expect to receive a letter from you requesting dates for the depositions of the plaintiff and his two sons. I have yet to receive any such letter but I have conferred with my clients and they can be available May 25, 29, 30 or 31. Prior to that Gregory Pitts will still be in school. We will make all three available at our office starting at 9:00 a.m. on the day of your choosing. Please let me know what dates work for you as soon as possible.

There are a number of depositions which we need to take and which I am requesting your assistance in setting up. Obviously we plan on taking Pete Clemmons deposition as soon as possible. It was clear from Mr. Gardner's interpretation of the service records at his deposition that Mr. Clemmons performed substantially all of the relevant work on Sandra Pitts' vehicle.

Along with Mr. Clemmons we plan on deposing the technician K. Young. Mr./Ms. Young is shown to have done work on Sandra's vehicle at the same visit during which Mr. Clemmons repaired the subject vehicle's left rear tire and is a possible witness to the repair.

We also need to depose the individual who was manager of the store during 2005. During his deposition Mr. Gardner indicated that this was an individual named Butch but he did not know Butch's last name.

We also need to take BRFC's loss prevention manager for the Southeast zone. We believe this individual is likely the person responsive to our 30(b)(6) deposition notice as it pertains to previous claims and lawsuits (see below) but even if you do not so designate him, we wish to take his deposition as an individual.

2142 Highland Avenue South | Birmingham, AL 35205-4002 | *Telephone:* 205.933.1277 | *Toll Free:* 866.989.9891 | *Fax:* 205.933-1272

www.lannyvines.com

Hope T. Cannon, Esq.
April 27, 2007
Page 2

With respect to these four individuals, it would be easier for all involved if we have your assistance in making them available on dates mutually convenient to all concerned. If I have not heard from you in this regard within seven (7) days, on or before May 4, 2007, I will go ahead and subpoena their depositions for the near future.

With regard to our previously served interrogatories, document requests and deposition notice, I write to set forth our disagreements with your objections and failure to produce certain testimony and materials responsive to same.

BFRC responded to Plaintiff's Request for Production No. 10 as follows:

10.    Please produce any and all documents evidencing any lawsuits against **you** for damages which were allegedly caused by negligent/wonton tire puncture repairs done during the years 2000 through 2005.

RESPONSE: BFRC objects to this request on the grounds that it is vague, overly broad, unduly burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. BFRC further objects to this request on the grounds that Plaintiff seek information regarding other incidents without regard for the similarity or dissimilarity of the circumstances involved. BFRC also objects to this request to the extent it seeks information protected from discovery as attorney-client communications and/or attorney work product.    As phrased, this request is broad enough to include communications, notes and memoranda created by or at the direction of counsel. Without waiving these objections, BFRC refers Plaintiff to its response to Interrogatory No. 9 above.

BFRC Inc., in its response to Plaintiff's Interrogatory No. 9 states as follows:

9. Identify any and all lawsuits filed against BFRC making claims for damages of any type allegedly caused by negligent/wanton tire repair arising out of any repair done by **you** during the years 2000 to 2005.

RESPONSE: BFRC objects to this interrogatory on the grounds that it is vague, overly broad, unduly burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. BFRC further objects to this interrogatory on the grounds that Plaintiff seek information regarding other incidents without regard for the similarity or dissimilarity of the circumstances involved. Without waving these objections, BFRC states that from time to time it receives lawsuits regarding products and services. However, BFRC does



Hope T. Cannon, Esq.
April 27, 2007
Page 3

not file or separate lawsuits by type of allegation.  Therefore, BFRC would have to conduct an unreasonably burdensome file-by-file search to identify all lawsuits based on allegation of "negligent/wanton tire repair" filed between 2000 and 2005.

BFRC objected on similar grounds to producing an individual knowledgeable about and prepared to testify concerning responsive lawsuits.

TOPIC NO. 4:  Testimony concerning any and all lawsuits filed against BFRC making claims for damages of any type allegedly caused by negligent/wonton tire repair done by BFRC during the years 2000 through 2005.

RESPONSE:  BFRC objects to this topic on the grounds that it is vague, overly broad, unduly burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  BFRC further objects to this topic on the grounds that plaintiff seeks information regarding other incidents without regard for the similarity or dissimilarity of the circumstances involved.  Without waiving these objections, BFRC states that from time to time it receives lawsuits regarding products and services.  However, BFRC does not file or separate lawsuits by type of allegation.  Therefore, BFRC would have to conduct an unreasonably burdensome file-by-file search to identify all lawsuits based on allegations of "negligent/wanton tire repair" filed between 2000 and 20005.   Consequently, BFRC will not produce a witness regarding this topic.  BFRC also refers plaintiff to its response to Topic No. 5 below.

BFRC's objections as to relevance are clearly inapplicable and inappropriate.  It cannot reasonably be disputed that the existence of previous lawsuits concerning negligent/wanton tire repairs done by BFRC and BFRC's knowledge of the same is directly relevant to the "amount of wrongdoing on the part of the defendants."  (APJI CIVIL 11.18)  As you know damages in an Alabama wrongful death case are "directly related to the culpability of the defendants and necessity of preventing similar wrongs in the future."  (Id.)  There is no more probative evidence of the defendants' culpability in this matter then that which concerns their notice of negligent/wanton tire repairs taking place at their stores and the measures taken to address such problems and prevent future harm to their customers including Sandra Pitts.

With regard to BFRC's objections that this request seeks privileged material we do not argue for production of any material which is truly protected from disclosure by the attorney-client privilege or attorney work product.



Hope T. Cannon, Esq.
April 27, 2007
Page 4

With regard to BFRC's objections as to the burdensomeness of this request, this argument is misplaced. Given that this evidence is of such direct and unquestionable probative value to plaintiff's wrongful death claim, it is unfair for plaintiff to be prejudiced by the manner in which BFRC and/or the other defendants have chosen to keep records. Nevertheless, plaintiff is willing to make reasonable accommodations so as to lessen the burden and expense to the defendants in making such materials available. I will welcome a proposal from you in this regard. In any event by this letter we are requesting these materials and testimony be produced.

With regard to plaintiff's similar discovery request regarding consumer complaints defendant's objections and our position are substantially the same. (See plaintiff's Request for Production No. 11 and BFRC's response thereto, plaintiff's Interrogatory No. 11 and BFRC's response thereto and plaintiff's 30(b)(6) deposition notice No. 6 and BFRC's response thereto). Therefore, we likewise request defendants produce materials and testimony concerning these matters.

BFRC responded to plaintiff's Request for Production No. 5 as follows:

5. Please produce any and all documents identifying employees who were working at The Subject Store on February 26, 2005 and December 15, 2005.

RESPONSE: BFRC objects to this request on the grounds that it is overly broad and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, BFRC states that P. Clemons performed tire work for Sandra Pitts on February 26, 2005 and December 15, 2005 and K. Young performed other mechanical work on the vehicle, as indicated on the invoices which will be produced.

It is difficult to understand how this material is not relevant let alone discoverable. Unquestionably every individual who was at the store on the days that Sandra Pitts's vehicle was serviced is a potential witness in this matter. As to the objection that the request is burdensome, Mr. Gardner stated clearly that there are documents in possession of the defendants (including time cards) that would identify these individuals. This issue warrants no further argument.

Plaintiff requested personnel files for Mr. Clemons and Mr. Young and BFRC responded as follows:

8. Please produce any and all employment records for the individuals who are identified in the materials attached hereto as Exhibit A as "K. YOUNG" and "P. CLEMONS".



Hope T. Cannon, Esq.
April 27, 2007
Page 5

RESPONSE: BFRC objects to this request on the grounds that it is overly broad and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. BFRC also objects to this request as unnecessarily invading the privacy of its employees.

As was clearly established at Mr. Gardner's deposition Mr. Young and Mr. Clemons are the only technicians identified as having worked on Sandra Pitts's vehicle while it was being serviced at the Madison Avenue Store. Clearly the employment histories of these individuals are discoverable in this matter as those histories may bear on BFRC's knowledge of the competence of said employees to safely repair their customer's tires. Plaintiff is willing to enter into a reasonable agreement providing for confidentiality of personal information contained in these records. Defendants have requested, and plaintiff has not objected to their requests for, confidential medical information concerning Sandra Pitts's children. Fairness dictates that her estate be allowed discovery of the even more relevant information contained in defendants' personnel files. As Mr. Gardner stated these personnel files are easily obtained from the district office. We request they be produced without any further delay.

With respect to the outstanding discovery outlined above this letter will serve as our attempt pursuant to FRCP Rule 37 to informally resolve these disputes. If we have no response from you within fourteen (14) days, i.e. on or before May 11, 2007, we will be forced to file a motion to compel.

Finally, you will find enclosed Plaintiff's Third Interrogatories to BFRC, Plaintiff's First Request for Admissions to BFRC and Plaintiff's Second Request for Production to BFRC. If you have any questions concerning these please do not hesitate to contact me.

Sincerely,

Bo Bruner

RPB/cbm
Enclosures
cc:     Lanny S. Vines
        Brittin T. Coleman, Esq.
        Kenneth M. Perry, Esq.

